182 N.J. Super. 455 (1982)
442 A.2d 635
IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF MARIO E. JASCALEVICH, M.D. TO PRACTICE MEDICINE AND SURGERY IN THE STATE OF NEW JERSEY.
Superior Court of New Jersey, Appellate Division.
Argued November 4, 1981.
Decided January 27, 1982.
*457 Before Judges MATTHEWS, PRESSLER and PETRELLA.
Henry F. Furst argued the cause for appellant (Brown, Brown & Furst, attorneys; Raymond A. Brown, Eugenie F. Tendrich and Henry F. Furst on the brief).
Bertram P. Goltz, Jr., Deputy Attorney General, argued the cause for respondent (James R. Zazzali, Attorney General of New Jersey; John J. Degnan, former Attorney General of New Jersey; Erminie L. Conley, Assistant Attorney General, of counsel; Bruce H. Snyder, Deputy Attorney General, on the brief).
The opinion of the court was delivered by PRESSLER, J.A.D.
Respondent Mario E. Jascalevich, a physician, appeals from an order of the New Jersey Board of Medical Examiners (Board) revoking his license to practice medicine and surgery in this State. We affirm.
*458 These proceedings were commenced by a complaint brought against respondent by the Board charging him with various acts alleged to constitute fraud in the practice of medicine, gross malpractice or gross neglect endangering the health and life of named patients and professional incompetence. See N.J.S.A. 45:9-6, 45:9-16(h), 45:9-16(i). Although the original and supplemental complaints were in 13 counts, only 7 were pursued. The first six of these counts related to Dr. Jascalevich's management of his patient, Julio E. Echeverria. The last, count XIII, related to his record-keeping responsibilities in respect of another patient, Themis Revis. Thirty-three hearing days were devoted to these proceedings by the specially designated hearing officer who thereafter filed an exhaustive statement of factual findings and recommendations.
The hearing officer's ultimate factual finding was that Dr. Jascalevich had deviated from applicable standards of professional practice and conduct. It was his conclusion, however, that these deviations amounted only to ordinary negligence and did not constitute gross malpractice, neglect or incompetence. It was, therefore, his recommendation to the Board that there was no adequate basis for the suspension or revocation of Dr. Jascalevich's license. The Board, in its review of the massive hearing record, generally accepted the hearing officer's basic findings of fact. It rejected, however, his characterization of respondent's conduct as ordinary negligence and determined that the acts he had been found to have committed constituted gross malpractice, negligence and incompetence within the statutory intendment. It also found him to lack the good moral character requisite for the practice of medicine. Accordingly, it ordered the revocation of his license.
The parties do not generally challenge the hearing officer's extensive basic findings. It is in any event clear that they are not only supported by sufficient credible evidence in the record as a whole but also that they are expressed with consummate clarity and completeness. We, accordingly, rely on them to the same extent as did the Board and respondent.
*459 Before considering the substance of these findings and respondent's appellate challenges to the proceedings, there is a preliminary matter we must address. The hearing officer was of the view that these disciplinary proceedings against a physician were subject to a clear-and-convincing standard of proof. His factual findings, therefore, accorded with that standard. The Board, although it noted its disagreement as to the appropriate proof standard and its belief that a preponderance standard generally applied, nevertheless concluded that the distinction in standards was not here relevant since, in accepting the hearing officer's factual findings, it was also thereby necessarily accepting the proof standard pursuant to which those findings were made. This observation under the circumstances here is fair and accurate. We are, therefore, satisfied that Dr. Jascalevich did receive the benefit of that higher standard of proof which, following the conclusion of the proceedings here, was held by us to be required in physician disciplinary proceedings. In re Polk License Revocation, 178 N.J. Super. 191 (App.Div. 1981). Dr. Jascalevich's argument to the contrary is, therefore, without merit.
With respect to the substantive findings, we consider first the charges relating to the patient Echeverria. Dr. Jascalevich removed Echeverria's gall bladder on July 26, 1974, in an apparently routine and unexceptionable operation performed at Christ Hospital in Jersey City. Echeverria did not, however, recuperate well and within several days of the surgery had developed such symptoms as weakness, pain, fever and large amounts of bile draining through the surgical wound. Accordingly, respondent performed a second surgical procedure on August 2, 1974, in which he drained the excess bile from the abdominal cavity. Both the pre- and post-operative diagnosis was subhepatic abscess. In his report of the second operation, which Dr. Jascalevich did not dictate until August 16, 1974, he noted various observations not made during the course of the first operation, including "several lymph nodes palpable in the area of the pancreas" and a "mass in the pancreatic region *460 which was considered to be too hazardous to biopsy." He concluded that "carcinoma in this patient cannot be ruled out on the basis of these findings." Dr. Jascalevich discharged Echeverria from the hospital on August 12. Three days later, on August 15, Echeverria visited Dr. Jascalevich in his office because of the continuing excessive drainage. Dr. Jascalevich aspirated the wound. After so doing he showed Echeverria a piece of tissue which purportedly came from the wound and which he then purportedly sent to the pathology department of the hospital for analysis and report. The pathology report was dated August 16 and its results telephoned that day to Dr. Jascalevich. According to the report, the Echeverria sample was "fibrodipose tissue showing infiltrating, hornifying, well differentiated squamous cell carcinoma." Dr. Jascalevich never, however, treated Echeverria for cancer nor referred him to an oncologist.
Apparently, and despite the cancer diagnosis, Echeverria made relatively good progress on routine antibiotic and other medication until early December 1974, when he was again admitted to Christ Hospital complaining of abdominal pain. Diagnostic tests failed to disclose evidence of any intrinsic biliary disease and, after conservative treatment with antibiotic medication, Echeverria improved sufficiently to be discharged in about a week. There was nothing in the report of this hospitalization suggesting that Echeverria was suffering from any form of cancer. In April 1975 Echeverria was admitted to Jersey City Medical Center again complaining of abdominal pain and jaundice. Dr. Jascalevich's admission note was "obstructive jaundice probably due to recurrence of carcinoma of bile duct diagnosed at time of admission to Christ Hospital." Shortly after the admission Dr. Jascalevich performed a third operation, this one a common duct bypass. Although Echeverria's recuperation from this operation was slow and difficult and his consequent hospitalization lasted three months, the bypass proved to be the solution of his biliary tract problems as they had evolved, and he ultimately made a good recovery. It was, by this time, clearly *461 demonstrated that he never did have any biliary tract cancer. This was apparently obvious when the bypass operation was performed in April and was, furthermore, confirmed the following May as a result of further diagnostic tests ordered by respondent's associate who had taken over Echeverria's case while respondent was on vacation and who had questioned the cancer diagnosis on a clinical basis. Dr. Jascalevich's operative report of the April 1975 surgery, was not, however, dictated until some six months later, in October 1975. The report stated, in part, that
Upon entering the abdomen a careful abdominal exploration was done. The patient was jaundiced, so we paid particular attention to the area of the duodenum and the pancreas and the common duct. Palpation of this area revealed tumor mass at the level of the junction of the common duct with the pancreas which was the possible neoplasm. Please note that this patient had a pathologic report, after cholecystectomy done at Christ Hospital about five months ago, showing histologically this patient's problem was carcinoma. Considering that this was probably an advanced growth, we decided then to do a by-pass of this common duct obstruction ... this choledochoduodenostomy was performed without difficulty....
The thrust of the Board's case against Dr. Jascalevich in respect of his management of Echeverria's case was that Dr. Jascalevich never believed that Echeverria had cancer; that he himself had fabricated the cancer indicia, and that he had failed, during the nine-month lapse between the gall bladder removal and the performance of the common-duct by-pass, to attempt any genuine diagnosis and effective treatment of Echeverria's continuing biliary tract problems, thereby endangering his life and health. The underlying implication was that the cancer diagnosis was invented by Dr. Jascalevich to explain the consequences of some mishap in the original operation, most likely an inadvertent nick of the common duct. Accordingly, the gravamen of count I of the complaint was that Dr. Jascalevich had knowingly misrepresented in the operative record of the second surgery that he had observed a mass in the pancreatic region. Count II charged him with submitting to the Christ Hospital pathology department a tissue sample which he knew was not Echeverria's but which he falsely represented to have come from *462 Echeverria's gall bladder bed. Count III was essentially the same as count II but named the other patient from whom respondent had allegedly taken the tissue sample which he represented to be Echeverria's. Count IV charged that in any event Dr. Jascalevich knew or should have known that the pathology report heretofore referred to could not have represented accurate findings concerning Echeverria. Count V charged Dr. Jascalevich with falsifying Echeverria's hospital records and with failing to provide Echeverria with an appropriate course of treatment. Finally, Count VI charged Dr. Jascalevich, in respect of the bypass surgery, with making a knowingly false preoperative diagnosis and a knowingly false post-operative record.
Despite the introduction of ample evidence tending to sustain the allegations of the first three counts, the hearing officer concluded that they had nevertheless not been proved by a clear and convincing standard. In effect, then, the hearing officer declined to find that any knowing or conscious action on Dr. Jascalevich's part produced that erroneous pathology report. What he did find, however, in sustaining the factual allegations of Count IV, was that whether or not Dr. Jascalevich was himself implicated in switching or misrepresenting tissue samples or in any other improper act resulting in the ultimate production of that report, nevertheless the contents of that report were at such odds with the known facts concerning Echeverria as to render it manifestly unlikely that the tissue which was the subject of the pathology report could have been tissue actually taken from Echeverria. The expert testimony was indeed overwhelming that, as applied to Echeverria, the pathology report was "bizarre" since carcinomas at the abdominal site from which the tissue purportedly came are typically adenocarcinomic in nature and virtually never of the squamous cell variety, and also because cancer at that abdominal site in a patient as young as Echeverria, who was then 30, is exceedingly rare. Moreover, further inquiry by Dr. Jascalevich into the slide studies on which the report was based would have confirmed *463 that the tissue could not be Echeverria's because of various histologic findings totally incompatible both with Echeverria's medical history and with the site from which the tissue sample purportedly came. Thus, as the hearing officer concluded with respect to Count IV:
... [C]areful and fair review of all the testimony referred to in this discussion of the Count IV charges leads to the conclusion that Dr. Jascalevich failed to discharge the responsibility that was his as Echeverria's surgeon by assuming that report 154318 [the August 16 pathology report] was correct.. . He persisted in this view without further investigation or any follow-up.
These deficiencies of Dr. Jascalevich were not, however, viewed by the hearing officer as constituting more than ordinary negligence.
With respect to count V, the essential allegations of which were also sustained, the hearing officer concluded that Dr. Jascalevich had indeed improperly treated Echeverria beginning with the second surgery. In short, it was his ultimate finding that that surgery, consisting only of the drainage of bile without any effort either to determine the cause of or to treat the underlying biliary tract problem, was desperately inadequate. The hearing officer further found that respondent's conduct was unexplained by his apparent belief that Echeverria suffered from biliary tract cancer since that condition was not treated either. In this regard, detailed reference to the hearing officer's findings is appropriate in view of the Board's ascription thereto of a gross malpractice characterization. Thus, the hearing officer found that
Assuming the correctness of Dr. Jascalevich's diagnosis of malignancy in his patient, the treatment he gave Echeverria for that condition in the months following the August 2, 1974 operation was strange indeed. As noted, the drugs that might be prescribed in a cancer situation were not prescribed, although this may have been because Echeverria did not complain of pain until late 1974 (the record is silent as to this). Pain and jaundice brought about the December 1974 admission to Christ Hospital. And then came the rather disastrous condition which required admission to the Jersey City Medical Center in April, the bypass operation, and the very rough post-operative course of the patient  an experience which would not permit of his discharge until early July.
Dr. Brief stated that it was Dr. Jascalevich's obligation to proceed further to explain the leakage that had occurred after the cholecystectomy: x-ray of the whole ductile system would have clarified if there had been an inadvertent *464 injury to the ducts during surgery. He was strongly of the view that it was the surgeon's duty to solve the problem in the course of the August 2 operation. And, it was a serious omission that Echeverria was not discharged on antibiotic therapy. Dr. Brief went on to say that assuming no error on the part of Dr. Jascalevich in diagnosing a carcinoma, he should have rehospitalized Echeverria in order to thoroughly evaluate him. There would be a repeat of cholangiographic studies, consultation with an oncologist and possibly a radiologist. If the condition then turned out to be a cancer, corrective surgery or palliative treatment would have followed. The doctor, said Dr. Brief, failed to get to the bottom of the problem with the biliary system: the December 1974 hospitalization was the result of earlier events  Echeverria had developed obstruction in the lower end of the bile duct, with pain and obstructive jaundice.
In short, Dr. Brief was especially critical of the August 2 operation for the bile accumulation; in his view, what was done was inadequate and improper in terms of goals. The major leak from the extraheptic biliary tree had not been properly cared for, and without this correction Echeverria was left open to scarring, recurrent bouts of cholangitis and subsequent jaundice. The care given Echeverria was not up to expected medical standards.
Dr. Saypol [defendant's expert], on the other hand, believed that what Dr. Jascalevich had done was the wisest thing to do, cancer or no cancer. The treatment Echeverria received was proper.
The State's oncology expert, Dr. Winn, pointed out that Echeverria had never been treated for cancer. Addressing the matter of the April 5, 1975 diagnosis by Dr. Jascalevich of cancer of the bile channels, Dr. Winn was of the opinion that there should have been a biopsy, and the risks of such procedure taken. Assuming there was an unresectable carcinoma, the next steps were palliation and consultation. No such steps were taken. The bypass was an acceptable procedure to keep jaundice from recurring, but that was not sufficient in Dr. Winn's view. (Dr. Saypol was critical of his testimony about palliation; he said that one does not go beyond surgery, for he saw nothing convincing about chemotherapy or radiation and would recommend neither).
I conclude that there was a lack of proper treatment, beginning with the August 2, 1974 subhepatic abcess operation and continuing thereafter. Dr. Jascalevich had an obligation then to find out just what was causing the bile leakage and to attempt to correct that situation. Instead, all he did was to relieve the patient of collected bile. If Echeverria had a malignancy  and the proofs are overwhelmingly that the mass which Dr. Jascalevich observed was nothing more than an inflammation of the head of the pancreas  the treatment that followed was not such as a cancer patient should have received. But that aside, there was no effort to find out just what the mass was, what the problem in the biliary tract was. The patient was allowed to go on with little more than an occasional office visit and simple medication; and the result was the hospitalization of December 1974 and the bypass surgery of April 1975.
The hearing officer did not, however, conclude that these deviations of Dr. Jascalevich constituted more than ordinary negligence.
*465 Finally, with respect to count VI, the hearing officer found that Dr. Jascalevich had not made a knowingly false preoperative diagnosis in connection with the April 1975 bypass operation. It was his conclusion that Dr. Jascalevich had not been proved, clearly and convincingly, to have known that Echeverria was cancer-free until May 1975, when further tests so indicated. Nevertheless, in respect of Dr. Jascalevich's operative report, made six months after the operation, the hearing officer had this to say:
However, one phase of the bypass operation cannot be disregarded. Apparently no tissue was sent to the pathology department, and there was no postoperative report to be found. Indeed, an operative report was not dictated until October, and it is quoted on page 17 of this report. Why, at that late date and knowing what Dr. Gildengers had told him of the tests, as well as the fact that Echeverria was making a fine recovery, Dr. Jascalevich should have dictated that the tumor mass at the level of the junction of the common duct with the pancreas was "the possible neoplasm," and why he should have dictated the sentence I have already mentioned ("Please note that this patient had a pathologic report, after cholecystectomy done at Christ Hospital about five months ago, showing histologically this patient's problem was carcinoma")  this was professionally wrong. Such a report must strike one as a delayed justification for a wrong diagnosis made months before.
Although the charge, as stated in Count VI with regard to the April 1975 operation, cannot be supported by what Dr. Jascalevich reported six months later, his October operative report represents a departure from correct professional conduct.
The final charge against Dr. Jascalevich related to another patient, one Themis Revis, upon whom Dr. Jascalevich had performed a hysterectomy as a result of which she developed a vesicovaginal fistula in her bladder requiring subsequent surgical repair. She brought an action against him for malpractice. During the course of discovery, questions arose regarding the operative report component of her hospital record. It was factually determined at this hearing that the operative report included in her hospital record was not the original report but rather a substituted report bearing forged signatures. The hearing officer found, however, that it was not proved that Dr. Jascalevich himself had altered the record. Nevertheless, the hearing officer did find that respondent had permitted an operative record which he knew not to be genuine to become part of *466 the patient's hospital record. It was his further conclusion, however, that that act did not provide a statutory basis for disciplinary action by the Board.
Despite any unexpressed reservations the Board may have had in respect of the foregoing findings, it nevertheless, as noted, opted to accept them, and accordingly dismissed counts I, II and III of the complaint. It concurred with the recommendation that the factual allegations of counts IV and V be sustained. With respect to count VI, the Board accepted the hearing officer's finding that there was insufficient proof that Dr. Jascalevich knowingly and deliberately made a false preoperative diagnosis of cancer in April 1975 but found on the basis of the proofs that he should have known that the diagnosis was false. The record amply supports this finding. The Board further concurred in the hearing officer's finding respecting the delayed and false operative reports of the April 1975 surgery. Finally, the Board concurred with the hearing officer's findings respecting count XIII.
The primary disagreement between the hearing officer and the Board was, as heretofore indicated, in their respective characterizations of the nature and quality of those aspects of Dr. Jascalevich's conduct which both agreed were improper. The first question before the Board, as it viewed the matter, was simply whether or not Dr. Jascalevich's conduct came within the ambit of disciplinary cause as defined by subsections (h) and (i) of the first unlettered paragraph of N.J.S.A. 45:9-16. Subsection (h) authorizes license suspension or revocation in the case of "gross malpractice or gross negligence in the practice of medicine which has endangered the health or life of any person." Subsection (i) authorizes license suspension or revocation where the practitioner "has been demonstrated professionally incompetent to practice medicine." The Board was persuaded that the adverse findings in respect of the count IV and count V allegations constituted disciplinary cause under both subsections.
*467 In so concluding the Board relied on this court's holding in In re Suspension or Revoc. License of Kerlin, 151 N.J. Super. 179, 186 (App.Div. 1977), in which we held, in the context of the practice of veterinary medicine:
It is obvious that the terms "neglect" and "malpractice," standing alone, import a deviation from normal standards of conduct. "Gross neglect" or "gross malpractice" suggest conduct beyond such wrongful action  how far beyond has been left to the judgment of the Board, subject, of course, to judicial review.
It noted further that while the term "professional incompetence" within the statutory intendment has not been judicially defined, that term has customarily been construed and applied by the Board to mean "any inability to conform with proper standards of professional conduct, and to include the lack of moral as well as physical or intellectual fitness to practice medicine."
Applying these definitional standards, the Board concluded, in respect of count IV, that Dr. Jascalevich's "unquestioning acceptance of the pathology report of squamous cell carcinoma and his failure to reconcile that report constituted gross malpractice or gross neglect which endangered the life or health of patient Echeverria within the meaning of N.J.S.A. 45:9-16(h) and professional incompetence within the meaning of N.J.S.A. 45:9-16(i)." Its reasons for this conclusion were dependent not only upon its own expertise but on the expert testimony and the hearing officer's findings as well. Thus it noted, among other circumstances, the overwhelming testimony regarding the manifest unusualness of the pathology report, the expert opinion that in the factual complex here "The surgeon could not assume that this thirty year old man had this rather bizarre tumor" and the consequent expert concurrence in the view that Dr. Jascalevich was obliged, because of the unusual nature of the report, to follow it up by a concentrated inquiry to determine the truth. Indeed, when asked to respond to a hypothetical question based on essentially those facts which the hearing officer later found to have been proved, Dr. Jascalevich's own expert, as the Board noted, characterized the assumed conduct as "total neglect" and as the act of a "totally irresponsible person."
*468 The Board reached the same ultimate conclusion regarding the proper characterization of the hearing officer's findings of mismanagement by Dr. Jascalevich of Echeverria's medical problems between the August bile drainage surgery and the April bypass operation. Again relying on the overwhelming weight of the expert opinion, it concluded that the August procedure and its consequent follow-up were grossly inadequate since no attempt was made to determine the true nature and cause of the biliary tract problem. Even more egregiously, it found that once the diagnosis of cancer was made, if it was indeed made in good faith, Dr. Jascalevich then ignored the diagnosis since he took no steps at all to treat the cancer. As the Board observed in this regard
Even more serious, however, was respondent's conduct after the laboratory diagnosis of carcinoma was received. As noted, respondent was grossly neglectful in accepting this report without further inquiry. Assuming such acceptance, however, respondent's further treatment of Echeverria evidenced gross indifference to the patient's welfare. Dr. Brief testified that assuming that respondent knew or believed that Echeverria had cancer, there was an obligation to rehospitalize him to determine where the tumor was, whether there were others, whether it was operable and, if not, whether other treatment might be appropriate. Failure to do so would be a substantial and medically unjustifiable departure from the physician's duty to the patient. Dr. Winn also believed that treatment through surgery or, if impossible, radiation or chemotherapy would have been called for. He further testified that any of these modalities of treatment might have been effective against the type of carcinoma believed to have been present.
........
Notwithstanding these views, the record is clear and the hearer found that respondent neither treated Echeverria for cancer nor informed any member of his family of that diagnosis until April of 1975. There can be no question that such conduct constituted a severe departure from normal standards of care. Had a proper course of investigation and treatment been followed, including rehospitalization and consultation with other physicians, it is likely that the actual source of the patient's problems would have been found and corrected. Thus the conduct plainly endangered Echeverria's health or life within the meaning of N.J.S.A. 45:9-16(h). Even if this likelihood is discounted, however, so that it would be possible that the failure to treat for cancer did not harm the patient because of the purely fortuitous circumstances that the patient did not actually have cancer, respondent's conduct would still constitute professional incompetence in violation of N.J.S.A. 45:9-16(i).
*469 In considering the hearing officer's findings as modified by it in respect of count VI, the Board again concluded that the conduct met the standards of subsections (h) and (i). More specifically, it was of the view that
... the knowing inclusion of a false diagnosis of carcinoma in the patient's records in October 1975 was not only, in the words of the hearer, "professionally wrong" but such an egregious departure from proper standards of conduct as to amount to gross malpractice or gross neglect endangering the patient's health or life pursuant to N.J.S.A. 45:9-16(h) and professional incompetence pursuant to N.J.S.A. 45:9-16(i).
The Board was further of the view that both in respect of Echeverria and Revis, respondent demonstrated lack of good moral character as required by N.J.S.A. 45:9-6. In respect of Echeverria this conclusion was based on respondent's false October report of the surgery of the previous April. The Board held that
The knowing entry of a false entry in a patient's record and the purposes of self-protection also in the Board's opinion demonstrates a patent lack of good moral character required by N.J.S.A. 45:9-6.
The Board also concluded that the findings regarding the Revis operative report also demonstrated a lack of good moral character.
Based on these findings and conclusions, the Board entered an order, following a separate penalty hearing, revoking Dr. Jascalevich's license to practice. In view of the foregoing factual and procedural background, we are satisfied that the action of the Board was based upon adequate credible evidence in the record as a whole, reflected an appropriate application of statutory standards, and, despite Dr. Jascalevich's numerous legal challenges, is not susceptible to interference by us.
It is first argued that the Board applied an improper standard of proof, namely a preponderance standard rather than a "clear and convincing one." While we agree that the Board was incorrect in its general view that the lesser standard applies, nevertheless, for the reasons we have heretofore stated, we are satisfied that in this matter it used the required higher standard.
*470 Dr. Jascalevich further contends that the Board fundamentally erred in its conclusion that lack of good moral character constitutes a permissible basis for license revocation. He recognizes that good moral character is expressly prescribed by N.J.S.A. 45:9-6 as a requisite to initial licensing. His argument, however, is that N.J.S.A. 45:9-16 is exhaustive and preclusive of the grounds upon which a license, once granted, is subject to suspension or revocation. See, e.g., State Bd. of Medical Examiners v. Weiner, 68 N.J. Super. 468 (App.Div. 1961). The only express reference in N.J.S.A. 45:9-16 to moral character is the stipulation of N.J.S.A. 45:9-16(c), which authorizes disciplinary proceedings based on conviction of a crime involving moral turpitude or a plea of nolo contendere or non vult to such a crime. Thus, the conclusion of the syllogism offered by respondent is that a lack of good moral character may constitute a disciplinary basis only if the indicia thereof constitute the basis of a criminal charge of which a physician has been convicted or to which he has pleaded.
The question of lack of good moral character as a basis for the discipline of physicians has not apparently been directly addressed by our courts, although it has been assumed that it constitutes such a basis. See In re Suspension of License of Wolfe, 160 N.J. Super. 114 (App.Div. 1978), certif. den. 78 N.J. 406 (1978). In other professional licensing contexts, however, our courts have noted, in considering the issue of whether a licensing requirement continues in effect during the entire period of licensure, that it "seems inconceivable that the Legislature intended to establish one standard for the issuance of a license and another for its renewal or revocation." N.J. Real Estate Comm'n Div. v. Ponsi, 39 N.J. Super. 526, 531 (App.Div. 1956). And see In re Berardi, 23 N.J. 485 (1957) (private detective license); Hyland v. Ponzio, 159 N.J. Super. 233 (App. Div. 1978) (professional engineer and land surveyor); In re Ridgway, 116 N.J. Super. 172 (App.Div. 1971) (securities broker-dealer). *471 We, therefore, are of the view that a clear demonstration of lack of good moral character is as viable a ground for license suspension or revocation as it is for the withholding of initial licensure.
Nevertheless, we rest our affirmance of the Board's action, to the extent it relied on lack of good moral character, on other grounds. In our view, it is not necessary here to deal with the general definitive scope or consequence of lack of good moral character in any general, abstract or conceptual sense.[1] We are satisfied that the specific actions of respondent which impelled the Board to conclude that respondent lacked that quality also directly implicate basic professional standards of practice and competence. Those actions, as noted, constituted the tampering by a physician with the integrity of his patient's medical records. In the case of Echeverria, respondent was found, in October 1975, to have included a post-operative note as to possible cancer when he knew the patient to be cancer-free. In the case of Revis, he was found to have knowingly permitted a forged operative record to become part of her hospital record.
We are persuaded that a physician's duty to a patient cannot but encompass his affirmative obligation to maintain the integrity, accuracy, truth and reliability of the patient's medical record. His obligation in this regard is no less compelling than his duties respecting diagnosis and treatment of the patient since the medical community must, of necessity, be able to rely on those records in the continuing and future care of that patient. Obviously, the rendering of that care is prejudiced by anything in those records which is false, misleading or inaccurate. *472 We hold, therefore, that a deliberate falsification by a physician of his patient's medical record, particularly when the reason therefor is to protect his own interests at the expense of his patient's, must be regarded as gross malpractice endangering the health or life of his patient.
Dr. Jascalevich challenges the revocation penalty here imposed as grossly disproportionate to the wrongs found and hence as constituting an arbitrary and capricious abuse of discretion by the Board. We do not agree. We will not ordinarily interfere with the imposition by an administrative agency of a penalty which, like the revocation here, is both jurisdictionally permissible and reasonable under the circumstances. See In Re Suspension of De Marco, 83 N.J. 25 (1980); In re Gastman, 147 N.J. Super. 101 (App.Div. 1977). And see, generally, Knoble v. Waterfront Comm. of N.Y. Harbor, 67 N.J. 427 (1975). Respondent's argument that the Board's penalty determination in any way rested upon his failure to have testified on his own behalf or on the Board's refusal to consider appropriate mitigation evidence is not supported by the record. Nor do we regard, in view of the findings here made, the revocation penalty to have been disproportionate.
Finally, respondent raises various objections to the role purportedly played by the Board's president which he suggests was not fully authorized by the Board itself; to an alleged lack of sufficiency of the basic findings to support the operative ultimate findings; and to the Board's application of the statutory standards to the totality of the findings. Our review of the record persuades us that these challenges have no support therein. The proceedings were conducted pursuant to appropriate due process standards in every respect.
The order of the Board of Medical Examiner's revoking respondent's license to practice medicine and surgery is affirmed.
NOTES
[1] Respondent concedes that N.J.S.A. 45:1-21, adopted in 1978, is applicable to physicians, supplements the grounds enumerated by N.J.S.A. 45:9-16 and includes as a disciplinary ground dishonesty, fraud, deception and misrepresentation. It was, however, stipulated that these proceedings were governed by pre-1978 legislation.