895 A.2d 437

IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE ISSUED TOKENNETH ZAHL, M.D., LICENSE NO. MA56413TO PRACTICE MEDICINE AND SURGERY IN THE STATE OF NEW JERSEY.

Argued March 6, 2006—Decided April 26, 2006.

342

*Douglas J. Harper,* Special Counsel, argued the cause for appellant, State Board of Medical Examiners (*Zulima v. Farber,* Attorney General of New Jersey, attorney; *Jeffrey C. Burstein,* Assistant Attorney General, of counsel).

*John Zen Jackson,* argued the cause for respondent, Kenneth Zahl, M.D. (*Kalison, McBride, Jackson & Murphy,* attorneys; *Mr. Jackson* and *Leonardo M. Tamburello,* on the brief).

*Robert J. Conroy,* submitted a letter in lieu of brief on behalf of amicus curiae, Medical Society of New Jersey (*Kern Augustine Conroy & Schoppmann,* attorneys).

Justice ZAZZALI delivered the opinion of the Court.

In this matter, the New Jersey State Board of Medical Examiners (Board) petitions the Court to restore the Board's order revoking the medical license of Kenneth Zahl. The Board found that Zahl, a physician specializing in anesthesiology, willfully engaged in numerous dishonest acts over a course of years, including Medicare and insurance fraud and maintaining improper patient records. The Appellate Division reversed the Board's penalty, concluding that license revocation is unduly harsh in view of the absence of patient harm. We hold that the Board was within the bounds of its statutory authority and discretion in revoking Zahl's license after the Board found Zahl to be a "fundamentally corrupt licensee." We therefore reverse the Appellate Division decision and reinstate the Board's order.

## I.

## A.

Kenneth Zahl obtained his medical degree from Columbia University Medical School in 1981. He then completed his residency in anesthesiology at the University of Pennsylvania and became a

board-certified anesthesiologist in 1986, receiving additional qualifications in the specialty of pain medicine soon thereafter. In 1993, Zahl founded Ambulatory Anesthesia of New Jersey (AANJ), a pain management and anesthesiology practice of which he was the sole shareholder and officer. From 1993 to 1998, AANJ had a contract with the Ridgedale Surgical Center to provide basic anesthesia services, primarily assisting the Center with cataract removals and interlocular lens implants. During that time period, Zahl hired a series of anesthesiologists to assist him.

In the summer of 1999, the Attorney General filed a complaint against Zahl with the Board, seeking revocation of his license. The eight-count complaint alleges that Zahl committed various acts of misconduct, including "dishonesty, fraud, deception, misrepresentation, false promise or false pretense," in violation of *N.J.S.A.* 45:1–21(b); gross and repeated acts of negligence and malpractice, in violation of *N.J.S.A.* 45:1–21(c) and (d); "professional or occupational misconduct," in violation of *N.J.S.A.* 45:1–21(e); the creation of false patient records, in violation of *N.J.S.A.* 45:1–21(h) and *N.J.A.C.* 13:35–6.5(b); and failure to maintain good moral character, in violation of *N.J.S.A.* 45:9–6. None of the allegations in the complaint, however, relate to the safety or quality of patient care rendered by Zahl.

The Attorney General petitioned the Board for summary decision on all counts of the complaint, but the Board denied that motion and transferred the case to the Office of Administrative Law. An Administrative Law Judge (ALJ) ultimately ordered revocation of Zahl's medical license, which the Board affirmed. To aid us in the review of the propriety of the Board's penalty, we now set forth the details surrounding Zahl's misconduct, as alleged in the complaint and found by the ALJ and the Board.

The eight counts in the complaint relate to five general areas of wrongdoing. First, the complaint alleges that Zahl submitted eighty-eight claims with overlapping time periods to the federal Medicare program for payment of medical services he rendered in

violation of federal Medicare billing guidelines. The complaint states that by committing federal Medicare fraud, Zahl breached his professional obligations under state law.

Questions concerning Zahl's Medicare billing practices first arose in spring of 1998 when Xact Medicare Services (Xact), the then federal Medicare contractor responsible for processing claims submitted by physicians within the State of New Jersey, initiated an investigation. Xact evaluated a sample of 104 of Zahl's Medicare patients between 1995 and 1997. After comparing Zahl's medical records and operating room schedules to the Medicare claims that he electronically submitted, Xact's fraud auditor concluded that Zahl's billing practices were "clearly improper." The auditor found that "virtually every beneficiary's anesthesia service overlapped with a subsequent patient's anesthesia service," indicating that Zahl had furnished services to two separate patients at the same time. The auditor stated that such practices are "neither authorized nor permitted under Medicare billing guidelines and the Medicare Carriers Manual." Subsequent to that investigation, Xact suspended Zahl's Medicare payments. Empire Medicare Services (Empire) succeeded Xact as New Jersey's Medicare contractor in 1999. At that time, Empire performed an additional audit of 105 of AANJ's federal Medicare claims and found that ninety-seven of those claims contained overlapping time periods.

After counsel for AANJ requested a Fair Hearing from the federal Medicare Hearing Office, the Hearing Officer ruled that Zahl was liable to Medicare for $2,071.34 in overpayment. The Hearing Officer determined that Zahl could not be found " 'without fault' ... based on the provisions in § 1870 of the [federal] Social Security Act." She reasoned that AANJ and Zahl "had been previously notified in numerous Medicare publications and correspondence with Xact Medicare Services and Empire Medicare Services of ... how to properly bill for blocks of time." AANJ pursued an administrative appeal from the Hearing Officer's decision. A federal administrative judge upheld the Hearing Officer's ruling and found that "the regulations do not permit the billing of

overlapping/concurrent anesthesia times." In the matter before us, the ALJ adopted the federal Hearing Officer's findings that Zahl had over-billed Medicare and concluded that he breached his professional obligations under state law.

Second, relying on essentially the same fact pattern described above, the complaint alleges that Zahl created false patient records in violation of state regulations by inserting overlapping time entries into the records of 102 patients. In support of that allegation, the complaint refers to an investigation performed by the Board into Zahl's record-keeping. During the investigation, the Board reviewed 102 of Zahl's patient records from late 1995 to late 1997 and, as had the federal investigations conducted by Xact and Empire, found substantial improprieties in Zahl's billing practices. The Board noted that in each record "there is a period of time common to both that patient and either the preceding or succeeding patient, or both," with the overlapping time frequently ranging from twenty-five to thirty-five minutes. At a hearing before the ALJ, Zahl also acknowledged engaging in over 800 anesthesia procedures where overlapping time periods were inserted into patient records, ninety percent of which were Medicare cases. The ALJ found that Zahl's insertion of overlapping time periods created false and inaccurate patient records.

Third, the complaint alleges that Zahl created false patient records by inserting the name of another doctor into records when that doctor had not performed the indicated functions. The allegation is substantiated by four doctors who certified or testified before the ALJ concerning the unauthorized insertion of their names into patient records. One doctor testified that Zahl had inserted her name into forty patient records although she had not been present during the patients' surgical procedures and did not provide them with anesthesia services other than limited pre-operative care. Another doctor certified that her name had been inserted into eight patient records although she had performed none of the functions indicated. Yet another doctor testified that her name was inserted into a patient record for a patient treated

on a day when she was not in the office and into a record for a patient that she did not treat. A final doctor, who was not even employed by AANJ but who had visited the office on two occasions to discuss employment possibilities, testified that her name had been inserted into three patient charts.

In assessing Zahl's motivation for inserting those doctors' names, an expert witness for the Attorney General testified that a dual doctor entry in patient records would make scrutiny of the records by an auditor more difficult. He also testified that dual entries potentially could serve as a defense to liability claims, because "if anything went wrong the anesthesiologist could say there were two anesthesiologists with the patient and therefore the patient had not been abandoned." The ALJ found that Zahl's insertion of the doctors' names falsely represented that the doctors had provided services to the patients.

Fourth, the complaint alleges that Zahl misrepresented his disability status to his disability insurer, thereby fraudulently collecting $118,000 in disability claims over the course of a nine-month period from 1998 to 1999. Zahl had been the holder of two disability insurance policies issued by Equitable Life Insurance Society (Equitable). In December 1997, Zahl sent a claim to Equitable informing them that he was "totally disabled" on and after December 8, 1997 as a result of cutting his left thumb while slicing cheese. Zahl described his job to Equitable as involving two functions: anesthesiology, rendering patients insensible to surgical pain; and pain management, treating chronic and acute pain conditions. Zahl informed Equitable that he "virtually [could not] do anything" and in the following months sent Equitable progress reports indicating that he could "only do some pain management" and did "not ever expect to return to anesthesia." However, medical records and testimony from another AANJ doctor revealed that Zahl was performing anesthesia services during that time period pursuant to the definition of anesthesia that he provided to Equitable. Equitable terminated Zahl's disability payments in 1999.

In an unrelated matrimonial matter involving a claim by Zahl's former wife for equitable distribution and child support, a New York trial court found Zahl's claim of disability not credible. *Kosovsky v. Zahl*, No. 310418/93, slip op. at 15 (Sup.Ct. Mar. 11, 1998), *aff'd*, 257 *A.D.*2d 522, 684 *N.Y.S.*2d 524 (1999). The ALJ in the present matter also determined that Zahl had knowingly made untruthful statements to Equitable to induce payments. She reasoned that Zahl had done so with an intent to use his claim of disability to defend against his former wife's property claims.

Finally, the complaint alleges that Zahl retained duplicate payments from different insurance companies for the same medical services. In 1996, Zahl treated a patient for spinal injuries. He again provided treatment to that patient in 1997. After each visit, Zahl submitted identical claims for the same services to two different insurance carriers, receiving and retaining payment from each. Zahl's billing clerk testified before the ALJ that she had informed Zahl that a second payment was received for the same service in 1996, and he told her to leave the check for him. She claimed that, after that conversation, relations deteriorated between her and Zahl and that Zahl terminated her shortly thereafter. The ALJ found that Zahl himself had filed the duplicate claims and had knowingly accepted and retained the claim benefits.

## B.

After granting summary judgment on three of the counts in the Attorney General's complaint and conducting a seven-day hearing on the remaining five counts, the ALJ found Zahl guilty of all counts. She ordered the revocation of Zahl's license, fined him $35,000 in civil penalties, and required him to reimburse one of his patient's insurance carriers for its duplicate payment in the amount of $1700. She also found Zahl liable to the State for its litigation costs in an amount to be determined by the Board.

The ALJ stated that Zahl's testimony was "evasive, convoluted and contradictory" and that "[a]t no time did the fact that he

committed these acts have meaning for him." She found that "[i]t was clear from Zahl's testimony and demeanor that he felt entitled to larger remuneration for his services and took advantage of available opportunities to obtain it." The ALJ emphasized that it was precisely "the quantity of deceit [that Zahl] was willing to practice for modest rewards" that she found troubling and warned that "[o]ne can only speculate on the possibilities if the stakes had been higher." The ALJ noted Zahl's willingness to put his colleagues in harm's way by inserting their names into medical records and exposing them to potential liability. She concluded that license revocation was appropriate because of the "sheer number of repeated instances of misrepresentation, fraud, and deceit present in this case, including respondent's shifting and inconsistent testimony." The ALJ added that Zahl's readiness to practice insurance fraud has "ramifications for the public at large in the form of increased insurance costs."

The Board subsequently conducted its own hearing to review the ALJ's decision. The Board heard mitigating testimony from four of Zahl's patients, who were complimentary of the treatment they received, Zahl's counsel in his suit against Equitable, who spoke of Zahl's veracity, and Zahl's present wife, who asked for leniency. Zahl also testified on his own behalf. He admitted that he had made some mistakes but maintained that he had done nothing wrong with regard to billing Medicare and that the statements he made to his disability insurer were taken out of context. Zahl submitted into evidence letters from patients and medical colleagues, his resumé, and a survey of the Board's prior determinations to demonstrate the disproportionate nature of the ALJ's penalty.

Despite Zahl's attempts at mitigation, the Board adopted substantially all of the ALJ's findings of fact and conclusions of law and affirmed the ALJ's order to revoke Zahl's license.[1] It noted

---

[1] The Board reversed the ALJ's conclusion that, in respect of Zahl's misrepresentations to his insurance carrier Equitable, Zahl had committed fraud, false

that it was affording "particular deference to the decision-making of the ALJ" because the ALJ's conclusions in this matter rested more on credibility determinations than on particularized medical knowledge. The Board emphasized that although it would have "unquestionably" reached the same determinations based on its review of the transcripts alone, such credibility judgments "necessarily are best made by the trier of fact." It further justified license revocation by stating:

> We note that there is a striking irony in this case. While the letters submitted and testimony offered suggest that Dr. Zahl may be a particularly revered and respected physician, Dr. Zahl's own misdeeds paint an entirely different picture of a fundamentally corrupt and dishonest licensee. We are constrained to point out that the fundamental issue we have considered in determining [the] penalty to be meted out is not whether Dr. Zahl is a competent practitioner (indeed, it was stipulated that the safety or the quality of care provided by respondent to his patients was never an issue in this case), but rather what sanction is necessary to redress Dr. Zahl's many misdeeds.

> We have concluded, as did ALJ Klinger, that the panoply of dishonest acts committed by Dr. Zahl support, if not dictate, imposition of the severe penalty of license revocation. The acts bespeak a fundamental disregard for truth which is ultimately inimical to the practice of medicine. Nothing presented in mitigation suggests that Dr. Zahl even today understands the moral repugnancy of his multiple acts of dishonesty and deception.

The Board also ordered Zahl to pay costs totaling $232,694.36, which includes investigative costs, expert witness fees, transcript fees, and attorneys' fees.

Zahl appealed the Board's order, and the Appellate Division granted Zahl's motion for a stay of his license revocation pending outcome of the appeal. The panel subjected the stay to the condition that Zahl comply with reporting requirements imposed by the Board. Upon review of the record, the Appellate Division issued an opinion affirming the Board's factual findings. However, the panel remanded the matter for reconsideration of the license revocation penalty because it found revocation to be "un-

---

promise, and false pretense, instead issuing only a finding of dishonesty, deception, misrepresentation, and professional misconduct concerning that behavior. The Board also decreased the civil penalties imposed by the ALJ from $35,000 to $30,000.

necessarily harsh." The panel reasoned that although Zahl's behavior "demonstrates a wide pattern of dishonesty," "there is no evidence that any patient's health or safety was even minimally compromised." The panel concluded that in light of the lack of patient harm, lesser penalties, such as controls over Zahl's billing and record-keeping practices, could adequately remedy Zahl's misconduct.

The Board appealed the Appellate Division's decision reversing Zahl's license revocation, and we granted certification. 185 *N.J.* 297, 884 *A.*2d 1267 (2005). We denied certification of Zahl's cross-petition seeking review of the Board's findings of fact, conclusions of law, and imposition of litigation costs. *Ibid.*

## II.

On appeal, the Board argues that by reversing the revocation of Zahl's license, the Appellate Division improperly substituted its judgment for that of the Board in violation of the deferential standard of appellate review of agency action set forth in *In re Polk License Revocation,* 90 *N.J.* 550, 449 *A.*2d 7 (1982). The Board also claims that by affording critical weight to the absence of patient harm, the Appellate Division improperly created a new precondition to license revocation that is not required by *N.J.S.A.* 45:1–21. Finally, the Board states that although Zahl's misconduct did not cause "direct physical harm" to any patient, the appellate panel erred in finding that "there is no evidence that any patient's health or safety was even minimally compromised." Rather, the Board emphasizes the critical importance of accurate medical records to both patients and the medical community.

Zahl responds that the Appellate Division properly exercised its powers of review to strike down a penalty that is unduly harsh and disproportionate. He argues that the Board did not sufficiently balance mitigating factors, such as the public's need for qualified practitioners and the fact that no patient harm occurred as a result of his misconduct. He states that by considering the lack of patient harm, the Appellate Division did not create a new precon-

dition to license revocation but merely weighed that factor in determining that license revocation was disproportionate to the offense. Zahl notes that other cases involving license revocation for improper record-keeping are distinguishable from his situation because those cases involved patient harm. Finally, he claims that the "astronomical" monetary penalties imposed on him by the Board in addition to other, lesser sanctions will adequately deter future misconduct.

### III.

#### A.

The Medical Practices Act (MPA) vests the Board with broad authority to regulate the practice of medicine in the State of New Jersey. *N.J.S.A.* 45:9–1 to –27. The Board has the power to promulgate rules and regulations to protect patients and licensees. *N.J.S.A.* 45:9–2. The Board's supervision of the medical field is critical to the State's fulfillment of its "paramount obligation to protect the general health of the public." *Polk, supra,* 90 *N.J.* at 565, 449 *A.*2d 7; *see also Brodie v. State Bd. of Med. Exam'rs,* 177 *N.J.Super.* 523, 529, 427 *A.*2d 104 (App.Div.), *certif. denied,* 87 *N.J.* 386, 434 *A.*2d 1068 (1981) ("Unquestionably, the Board has broad authority to adopt rules designed to protect the health, safety and welfare of patients of its licensees.") (citations omitted). Under the MPA, a physician's licensure is contingent upon a physician maintaining good moral character. *N.J.S.A.* 45:9–6 (requiring that applicant for medical license make showing of good moral character); *Polk, supra,* 90 *N.J.* at 576, 449 *A.*2d 7 (stating that *N.J.S.A.* 45:9–6's requirement of good moral character is continuing).

The Uniform Enforcement Act (UEA), *N.J.S.A.* 45:1–14 to –27, was enacted to create uniform standards for "license revocation, suspension and other disciplinary proceedings" by professional and occupational licensing boards, *N.J.S.A.* 45:1–14. The UEA, which works in tandem with the MPA, also grants the

Board disciplinary powers over medical licensees. *Del Tufo v. J.N.*, 268 *N.J.Super.* 291, 296, 633 *A.*2d 572 (App.Div.1993). Those powers include the right to suspend or revoke the medical license of a physician on proof that the physician committed certain acts of misconduct. *N.J.S.A.* 45:1-21. For example, the Board may revoke a physician's license if the physician

> b. Has engaged in the use or employment of dishonesty, fraud, deception, misrepresentation, false promise or false pretense;
>
> c. Has engaged in gross negligence, gross malpractice or gross incompetence which damaged or endangered the life, health, welfare, safety or property of any person;
>
> d. Has engaged in repeated acts of negligence, malpractice or incompetence;
>
> e. Has engaged in professional or occupational misconduct as may be determined by the board; [or]
>
> . . . .
>
> h. Has violated or failed to comply with the provisions of any act or regulation administered by the board.
>
> [*Ibid.*]

## B.

Our appellate review of an agency's choice of sanction is limited. Courts generally afford substantial deference to the actions of administrative agencies such as the Board. *Matturri v. Bd. of Trs. of the Judicial Ret. Sys.*, 173 *N.J.* 368, 381, 802 *A.*2d 496 (2002). Deference is appropriate because of the "expertise and superior knowledge" of agencies in their specialized fields, *Greenwood v. State Police Training Center*, 127 *N.J.* 500, 513, 606 *A.*2d 336 (1992), and because agencies are executive actors, *Matturri, supra*, 173 *N.J.* at 381, 802 *A.*2d 496 (stating that "[c]ourts have only a limited role to play in reviewing the actions of other branches of government") (alteration in original) (citation omitted); *Public Service Electric & Gas Co. v. New Jersey Department of Environmental Protection*, 101 *N.J.* 95, 103, 501 *A.*2d 125 (1985) ("In light of the executive function of administrative agencies, the judicial capacity to review administrative actions is limited.") (citation omitted). As such, the Court will modify a sanction

only when necessary to bring the agency's action into conformity with its delegated authority. The Court has no power to act independently as an administrative tribunal or to substitute its judgment for that of the agency. It can interpose its views only where it is satisfied that the agency has mistakenly exercised its discretion or misperceived its own statutory authority.

[*Polk, supra*, 90 *N.J.* at 578, 449 *A.*2d 7.]

This Court also has noted: "It has been stated that the test in reviewing administrative sanctions is 'whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness.'" *Ibid.* (quoting *Pell v. Bd. of Educ.*, 34 *N.Y.*2d 222, 233, 356 *N.Y.S.*2d 833, 313 *N.E.*2d 321 (1974) (internal quotation marks and citation omitted)); *see also In re Markoff License Revocation*, 299 *N.J.Super.* 607, 613, 691 *A.*2d 862 (App.Div.1997) (affirming Board's decision not to reinstate physician's license because sanction did not "shock one's sense of fairness") (citing *Polk, supra*, 90 *N.J.* at 578, 449 *A.*2d 7).

## IV.

██ Applying those principles of deference to the facts of this appeal, we hold that the Board was within the bounds of its statutory authority and discretion in concluding that the "panoply of dishonest acts committed by" Zahl warrants the revocation of his license. Under *N.J.S.A.* 45:1–21(b) dishonesty is a sufficient basis to justify license revocation. Doctors today interact with a broad array of actors beyond their patients, including the federal and state governments, private insurance companies, and medical colleagues. *See Windham v. Bd. of Med. Quality Assurance*, 104 *Cal.App.*3d 461, 470, 163 *Cal.Rptr.* 566 (1980). Engaging in dishonest behavior with those non-patient actors has ramifications for the public at large in the form of increased taxes to fund public healthcare programs, higher insurance premiums, added litigation, and the like. Moreover, patients rightfully may fear entrusting a deceitful physician with their lives and the lives of their loved ones for it is "difficult to compartmentalize dishonesty in such a way that a person who is willing to cheat his government ... may yet be considered honest in his dealings with his patients." *Ibid.; see also Haley v. Med. Disciplinary Bd.*, 117 *Wash.*2d 720, 818 *P.*2d

1062, 1069 (1991) ("[C]onduct may indicate unfitness to practice medicine if it . . . lowers the standing of the medical profession in the public's eyes."); *In re Kindschi License Revocation,* 52 *Wash.*2d 8, 319 *P.*2d 824, 826 (1958) (stating that because of life and death consequences of practicing medicine, public has "right to expect the highest degree of trustworthiness of the members of the medical profession").

The Board's decision is buttressed by the fact that the Legislature did not require a finding of patient harm before authorizing license revocation, *N.J.S.A.* 45:1-21, but instead enacted a requirement that medical licensees maintain good moral character, *N.J.S.A.* 45:9-6; *Polk, supra,* 90 *N.J.* at 576, 449 *A.*2d 7 (stating that *N.J.S.A.* 45:9-6's requirement of good moral character is continuing). Further, our sister state of New York has found that dishonesty can render a physician unfit to practice medicine. *See, e.g., In re Dahl v. New York State Dep't of Health,* 274 *A.D.*2d 619, 710 *N.Y.S.*2d 193, 194 (2000) (affirming license revocation of physician who kept improper records and submitted fraudulent claims to Medicaid).

Here, over a course of years and under varying circumstances, Zahl repeatedly engaged in deceitful and fraudulent conduct. He over-billed Medicare, retained duplicate payments from his patient's insurance company, made misrepresentations to his own disability carrier, and inserted his colleagues' names into patient records for patients they did not treat. His actions demonstrate disregard for the public, by potentially increasing taxes and insurance premiums, and for his colleagues, by exposing them to potential claims of liability.

Despite his egregious misconduct, Zahl cites our decision in *Polk* to argue that the Board did not sufficiently weigh mitigating factors in deciding to revoke his license. We agree with Zahl that because an occupational license is a property right, albeit one that is subject to substantial government regulation, the Board, when exercising its disciplinary authority, must consider mitigating factors. *Polk, supra,* 90 *N.J.* at 562-63, 579, 449 *A.*2d 7. In so doing,

it must "scrupulously consider all factors relevant to continued licensure ... [and] meticulously weigh the public interest and the need for the continued services of qualified medical doctors against the countervailing concern that society be protected from professional ineptitude." *Id.* at 579, 449 *A.*2d 7. However, in *Polk* we required the Board to reconsider its order of revocation because it had adopted the ALJ's recommended penalty of license revocation before hearing argument from the licensee's counsel concerning mitigating circumstances. *Id.* at 580 n. 3, 449 *A.*2d 7; *see also In re Fanelli License Revocation,* 174 *N.J.* 165, 166–67, 803 *A.*2d 1146 (2002) (remanding matter to Board for reconsideration of penalty when Board ordered license revocation without holding hearing on appropriateness of sanction).

The facts underlying the present appeal are a far cry from those in *Polk.* The Board afforded Zahl a hearing at which numerous witnesses offered mitigating testimony on Zahl's behalf. Zahl also submitted various documents into evidence, such as letters from medical colleagues and patients. The Board considered the mitigating evidence and found that that evidence, which primarily spoke to the level of patient care provided by Zahl, did not alter the fact that Zahl's misconduct shows him to be a "fundamentally corrupt and dishonest licensee." To be sure, Zahl's level of patient care was never an issue in this matter because the Attorney General stipulated that Zahl's misconduct did not result in patient harm before disciplinary proceedings began. Nonetheless, the Board found that regardless of the level of patient care that Zahl provided, Zahl's dishonest and deceptive conduct was so extreme as to be "inimical to the practice of medicine," necessitating the revocation of his license to protect the public.

Zahl also argues that because the Board did not adequately consider the lack of patient harm, the penalty of revocation is disproportionate to his misconduct. Relying on *In re Jascalevich License Revocation,* 182 *N.J.Super.* 455, 442 *A.*2d 635 (App.Div. 1982), he claims that other physicians whose licenses were revoked by the Board for committing fraud caused patient harm in addition

to that fraud. Although *Jascalevich* involved both fraud and patient harm, *id.* at 458, 442 *A.*2d 635, it does not follow that under the facts in this matter it was inappropriate for the Board to revoke Zahl's license. *Cf. Fanelli, supra,* 174 *N.J.* 165, 803 *A.*2d 1146 (reviewing Board's decision to revoke license because physician illegally withdrew funds from employee benefit plan and remanding on separate ground that Board failed to afford physician hearing); *In re Wolfe License Revocation,* 160 *N.J.Super.* 114, 388 *A.*2d 1316 (App.Div.), *certif. denied,* 78 *N.J.* 406, 396 *A.*2d 592 (1978) (revoking license because physician illegally permitted wife to practice medicine without license).

The Board did not rest its penalty determination on Zahl's fraudulent conduct in a vacuum, divorced from the individual circumstances of his case. Rather, the Board stated that it was affording particular deference to the ALJ's credibility judgment in respect of Zahl's shifting and inconsistent testimony. Moreover, observing Zahl over the course of a seven-day hearing, the ALJ found that he lacked remorse and continued to exhibit a sense of entitlement to the fraudulently obtained funds. As an appellate tribunal, we too defer to those credibility and character judgments.

## V.

The judgment of the Appellate Division is reversed. We remand this matter to the Board for revocation of Zahl's license.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

Opposed—None.