868 A.2d 1149 (2005)
376 N.J. Super. 29
Paul E. NEWELL, Esq., Charles S. Adubatto, Esq. and Newell & Adubatto, Plaintiffs-Respondents,
v.
Dora M. HUDSON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted February 2, 2005.
Decided March 16, 2005.
*1150 Edward G. O'Byrne, Totowa, attorney for appellant.
Giordano, Halleran & Ciesla, Middletown, attorneys for respondents (Michael J. Canning, of counsel; Mr. Canning and Catherine J. Bick, on the brief).
Respondent Paul E. Newell filed a supplemental pro se brief.
Before Judges NEWMAN, AXELRAD and R.B. COLEMAN.
The opinion of the court was delivered by
AXELRAD, J.T.C. (temporarily assigned).
Defendant Dora Hudson ("Hudson") appeals from two orders for summary judgment in favor of plaintiff Paul E. Newell, Charles S. Adubato[1] and their law firm (collectively referred to as "Newell"), dismissing her counterclaim for legal malpractice and awarding attorneys' fees and costs to Newell on his affirmative claim for services rendered to defendant in her divorce litigation.
At issue in this appeal is whether a litigant who either lied, or later claimed she lied, about her understanding and voluntary acceptance of the terms of her property settlement agreement, in order to induce the court to accept and incorporate it into a judgment of divorce, is judicially estopped from asserting a claim for malpractice against her matrimonial attorney based on the settlement. The trial court found she was. We agree and affirm.

I
Hudson, an accountant, retained Newell to defend her in a matrimonial action filed by her then-husband Mark Hudson. The parties had a nine-year marriage with no children. On the trial date, January 31, 2001, after lengthy negotiations and discussions with her attorney, Hudson signed an Interspousal Agreement. The settlement agreement provided, among other terms, for Hudson to receive limited duration alimony of $3,000 per month for four years[2] "based upon an annual income to *1151 [husband] of $175,000 base pay plus discretionary bonus and an annual income to [Hudson] of $60,000." The agreement also provided for an even distribution of non-personal property assets, including the marital home and investment accounts. The agreement contained the following pertinent language:
6.1 Knowledge of Facts. [Husband] and [Hudson] expressly acknowledge that this Agreement has been prepared without exchange of financial statements, records, and other documentation pertaining to his or her financial status, income, expenses, assets, and liabilities, as each party is satisfied that he or she is aware of the other's financial circumstances. The parties have exchanged Case Information Statements and waive their right to further discovery, including interrogatories and depositions, as each is satisfied that the financial condition of the parties is as stated in the Case Information Statements. Each party represents to the other the completeness, truthfulness, and accuracy of representations made by the other party, with the understanding that the other party is relying thereon in accepting the terms of the settlement contained herein and execution of the within Agreement. In the event that either party has willfully misstated his or her financial status, income, expenses, assets, or liabilities, the other party shall be entitled to file an appropriate application with the court.
6.3 Voluntary Execution. The parties each acknowledge and represent that this agreement has been executed by them, and each of them, free from persuasion, fraud, undue influence, or economic, physical, or emotional duress of any kind whatsoever exerted by the other party.
Prior to Hudson signing the agreement, Newell had given her a copy of our Supreme Court's decision in Crews v. Crews, 164 N.J. 11, 751 A.2d 524 (2000), and explained the concept of alimony and advised her that the amount of alimony she received might depend, in part, on the marital standard of living. When Hudson told Newell she wanted permanent alimony, he advised her she would likely only receive limited duration alimony and suggested they attempt to negotiate the amount.
After entering into the agreement, Hudson and her husband each testified that they understood and voluntarily consented to the terms of the agreement. Paraphrasing her testimony, Hudson further stated:
The limited duration alimony would permit her to maintain the standard of living she enjoyed during the marriage for at least the next four years;
She understood that if the divorce went to trial she might get more or less alimony than provided by the agreement; The agreement was a compromise but was a fair deal; and
She had discussed the settlement with Newell at great length throughout the course of the day and he had answered all of her questions.
Based upon this testimony, Judge Locascio approved the agreement which was incorporated into a final judgment of divorce.
On or about February 1, 2001, Hudson wrote a letter to Newell in which she stated she felt "pressured and intimidated by [her husband's counsel], the Judge, and [Newell]," and took issue with the adequacy of Newell's preparation and legal representation. Newell replied in a February 3, 2001 email, expressing his belief that Hudson would have received less alimony had *1152 the case proceeded to trial. He noted that she had reviewed the settlement carefully over approximately eight hours of negotiations between the parties and that she had testified under oath she understood the terms of the settlement agreement and voluntarily entered into it.
Hudson retained different counsel who filed a motion to modify or set aside the divorce judgment on the grounds that her husband had misrepresented his income in that his bonus was not discretionary but was guaranteed. The following colloquy transpired at oral argument on April 12, 2003:
[HUDSON'S COUNSEL]: My client would just like me to point out, Your Honor, that her main contention . . . is that the salary stated in the property settlement agreement from Mr. Hudson at [$]175[,000] wasn't entirely accurate, that his salary is actually [$]260,000.
. . . .
[MARK HUDSON'S COUNSEL]: First of all, Judge, there's no mistake whatsoever. If you look at her own case information that she had filed the previous year, she knew what my client's income was . . . She said $290,000 . . . In addition, on the day we were coming in for trial her attorney had . . . sent the proposal for resolution of this matter [stating] . . . "Your client will be free and clear to enjoy his $225,000 per year income."
I mean, all along we've discussed this based upon my client making more income. The only thing was that [$]175[,000] was his base. There was no mistake here, absolutely not . . . I attached the previous certifications [6/7/00] that were filed with the Court in her pendente lite motion. She was fully aware of how much income [her husband] made.
. . . .
THE COURT: Let me see. Paragraph 2. ["]He described his income as [$]175 [,000] annually, plus a discretionary bonus. The Court should be made aware that this discretionary bonus has been as high as [$]50[,000] . . ." So she knew that.
. . . .
[HUDSON'S COUNSEL]: She's saying that it's not discretionary, the property settlement agreement is wrong.
. . . .
THE COURT: She knew about a bonus of every year of $50,000 in her own certification. She's playing fast and loose with semantics, counsel. She's jumping on the word discretionary when her own certification indicates she knew darn well he got it.
Following oral argument, Judge Locascio denied Hudson's motion and awarded her husband $1250 in counsel fees on his cross-motion.

II
Hudson failed to pay the outstanding bill of $8,128.75 for the legal services rendered by Newell. Newell sent her a pre-action notice as required by Rule 1:20A-6 and, on June 11, 2001, instituted suit for collection. Hudson answered and filed a counterclaim alleging that Newell had committed legal malpractice by failing to serve interrogatories upon or depose her former husband, secure documents reflecting the status of certain investment accounts as of the date of filing of the divorce action, have an expert conduct an analysis of the assets acquired during the course of the marriage, and attempt to reopen the divorce settlement at her request. These failures, Hudson claimed, resulted in her "accept[ing] a settlement which was woefully insufficient in terms of both alimony/spousal support and equitable distribution."
*1153 In her deposition taken in the malpractice action, Hudson repudiated her January 31, 2001 testimony pertaining to her understanding of the settlement agreement and the fact she might be awarded more or less alimony if the case went to trial, the fairness of the agreement, the voluntary manner in which she had entered into it, her belief that the alimony provided under the agreement would permit her to maintain her standard of living, and the degree to which Newell discussed the settlement and answered her questions in a satisfactory manner. In essence, Hudson testified that her sworn testimony to Judge Locascio, which she understood was being offered to obtain his approval of the settlement, was false. Hudson also stated during her deposition that during the course of her marriage she was aware of all of her own, her former husband's, and their joint assets; she was unable to identify any asset that would have been discovered had Newell requested the discovery cited in her counterclaim.
On November 19, 2003, Newell filed a motion for summary judgment to dismiss Hudson's counterclaim, attaching the settlement agreement, transcripts of the two hearings before Judge Locascio, Hudson's June 7, 2000 certification filed in the divorce action, and portions of Hudson's deposition transcript. Hudson cross-moved for an in limine order to bar reference to her allegedly false testimony during the divorce settlement. In opposition to Newell's motion, she presented a July 16, 2003 report of Robert B. Cherry, Esquire and a November 13, 2003 report of Stephan C. Chait, CPA. Following oral argument, by order of February 5, 2004, Judge Quinn granted Newell's summary judgment motion and denied Hudson's in limine motion, stating:
This is a case for a legal malpractice saying that [Hudson] wasn't adequately advised as to the impact of the Crews decision.[3]
As indicated in the moving papers, [Hudson] as an accountant was completely familiar with all of the financial information that would be relevant for purposes of the divorce and indeed, from that time to the present time, no non-disclosed income has ever been forthcoming. So the fact that the lawyer didn't conduct discovery is really not relevant. This information was known to Ms. Hudson and her husband. There's no dispute then and there's no dispute now that that information would have changed or was in any way inadequate.
[Hudson] now maintains that the alimony should have been more and should have been permanent [a]lthough quite frankly, the award in the property settlement agreement was more than the pendente lite alimony and certainly more than the expenses of [Hudson] as reflected in the case information statement.
The deposition testimony of [Hudson] is interesting because quite frankly, it is completely at variance with her sworn testimony at the hearing in connection with this case. At the hearing in the case, [Hudson] clearly testified that she understood what she was entering into and that's what she wanted the Court to do, to approve.
[t]his Court finds that Judge Locascio accurately described [Hudson]'s position as just simply changing her mind. And I agree with Judge Locascio. This is not a case where she was misinformed as to the criteria to be employed and indeed, the record reflects under oath *1154 that she previously had herself been given a copy of the Crews decision.
She's a sophisticated party. She has an accounting degree. The Court can readily assume that she understood what she was doing in connection with this matter and I find that she clearly took the position with the Court that she wanted to approve this settlement. And that she did so knowingly and that she didn't have any questions of anyone.
And again, the record reflects, she actually acknowledged having discussed the Crews decision . . . and having read it and had a copy of it.
It would be impossible in this Court's view to frankly have. . . any finality associated with divorce cases particularly with reference to establishing the issues articulated in Crews if . . . a party such as Ms. Hudson who is herself an accountant [can go before a court and] say yeah, I've got the Crews decision. I understand the Crews decision and then decide that later that she wants a different settlement than was entered into between the parties in this case.
Judge Quinn explained the reason he was invoking the doctrine of judicial estoppel:
[T]he Court is going to grant the motion for summary judgment essentially based on the doctrine of estoppel or judicial estoppel and that is to say a party cannot take one knowing and willful position in connection with a judicial proceeding and then completely repudiate that decision. The doctrine of estoppel [is] essentially set forth in Scarano v. Central Railroad [Co., 203 F.2d 510 (3d Cir.1953)]. . . there is a five element test for judicial estoppel.
. . . .
The doctrine of estoppel is really intended to protect the integrity of the judicial process(citations omitted).
. . . .
Here, [Hudson] clearly, and it couldn't be more clear, set forth her understanding of the agreement and clearly satisfied Judge Locascio on her understanding of the agreement. Judge Locascio based on the directive of the court in Stout v. Stout, 155 N.J.Super. 196, 382 A.2d 659 [(App.Div.1977)] and Crews v. Crews [citation omitted], made the appropriate inquiry of her at the time of the divorce proceeding.
And [Hudson] again is an accountant and answered all of the questions, the property settlement agreement had been altered substantially throughout the course of the day and she clearly indicated that she understood she had received a copy of Crews and understood what she was doing.
[Hudson] changed her mind later that night; that's what Judge Locascio found in connection with his denial of post judgment motions. And indeed, I think everyone can understand and acknowledge that that's what occurred in this case. [Hudson] just simply changed her mind. The argument that she was misinformed or misled is one that has come up, you know, substantially later as a rationale for bringing this suit.
[Hudson] isn't misled in any circumstance where she simply changes her mind. The letter that she directed later that night to [Newell] indicates that she changed her mind, not that she had been misled. Being misled or misinformed which would be the basis of the legal malpractice action is that she received subsequent information that would result in her either trying to change the agreement or bringing an action against [Newell] for the agreement itself.
. . . .
She just simply changed her mind and I don't think that you are misinformed by your lawyer when you testify under *1155 oath that you know about the decision, that you're actually getting a property settlement agreement alimony amount that is greater than the pendente lite amount and that it is clearly an amount sufficient to cover your expenses and that you know what you're doing.
There's no way that any matrimonial lawyer under these circumstances could ever protect themselves from a legal malpractice case. Indeed and in fact, any matrimonial litigant need only enter into a property settlement agreement getting what's as easy as they can get from their spouse, and the very next day, turn around and try and get more money from their matrimonial lawyer.
I find, therefore, in order to protect essentially the integrity of the judicial system, that here [Hudson] simply changed her mind, that based on the doctrine of estoppel and specifically, judicial estoppel, that this case should be dismissed and I'm going to grant the motion for summary judgment dismissing the counterclaim for legal malpractice for those reasons.
Thereafter, Newell moved for summary judgment on his affirmative claim for counsel fees and Hudson cross-moved for summary judgment pursuant to Saffer v. Willoughby, 143 N.J. 256, 670 A.2d 527 (1996), asserting Newell was barred from collecting fees for services negligently rendered. Considering that Hudson had not challenged the reasonableness of the time expended by Newell or the amount of his bill, on April 2, 2004 Judge Quinn granted summary judgment in Newell's favor for the outstanding fees, costs, and interest totaling $10,768.51. The judge denied Hudson's cross-motion based on his prior order dismissing her malpractice claim, stating:
If all you needed to do was to make an allegation of malpractice and try and cherry pick specific things that could have or should have been done in connection with a matrimonial case, we'd never have any finality to them and matrimonial lawyers would be in constant litigation because you can always second guess someone and you can always with the benefit of hindsight argue that certain things should have been done.

III
In support of her appeal of Judge Quinn's orders granting summary judgment on her legal malpractice counterclaim and Newell's collection action, Hudson asserts: (1) there is undisputed material evidence that Newell improperly advised her to settle her divorce action; (2) under Ziegelheim v. Apollo, 128 N.J. 250, 607 A.2d 1298 (1992), judicial estoppel is not a defense to a lawyer who improperly advises his client to accept a divorce settlement; (3) she relied upon the bad advice she received from Newell and her background as an accountant or knowledge of the Crews decision is irrelevant; (4) her knowledge of her husband's assets and of the Crews decision does not preclude her from suing Newell for negligently advising her to accept an inadequate settlement; and (5) in light of the competent proof that Newell had committed attorney malpractice, his motion for summary judgment for fees and costs should have been denied. We are not persuaded by any of these arguments.
The doctrine of judicial estoppel is well entrenched in New Jersey's jurisprudence. It is "an equitable doctrine precluding a party from asserting a position in a case that contradicts or is inconsistent with a position previously asserted by the party in the case or a related legal proceeding." Tamburelli Properties v. Cresskill, 308 N.J.Super. 326, 335, 705 A.2d 1270 (App.Div.1998).
*1156 Over a hundred years ago the United States Supreme Court set forth the fundamental precepts of the doctrine of judicial estoppel:
It may be laid down as a general proposition that, where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice to the party who has acquiesced in the position formerly taken by him.
[Davis v. Wakelee, 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1895).]
This doctrine is intended to protect the integrity of the judicial system and is designed to prevent litigants from "playing fast and loose with the courts." See Tamburelli, supra, 308 N.J.Super. at 335, 705 A.2d 1270 (citing Scarano v. Central Railroad Co., 203 F.2d at 513).
Several courts throughout our country have granted summary judgment motions in legal malpractice actions based on the doctrine of judicial estoppel where a litigant repudiates a prior, sworn inconsistent statement made in order to secure an advantage in or judicial approval of the underlying settlement. "The rationale underlying the theory of judicial estoppel is the preservation of the sanctity of the oath and elimination of prejudice in the administration of justice. One may not assert a particular position in order to serve one purpose, then assert a wholly contrary position to serve another." Owen v. Knop, 853 S.W.2d 638, 643 (Texas App. 1993) (holding a client was judicially estopped from asserting attorney's failure to timely file suit as the basis for her legal malpractice claim in view of her earlier sworn statement that the discovery rule applied to save her cause of action for medical malpractice).
In McKay v. Owens, 130 Idaho 148, 937 P.2d 1222 (1997), the Idaho Supreme Court applied the doctrine of equitable estoppel to dismiss the plaintiff's legal malpractice claim stemming from an underlying medical malpractice action. The prior action had settled and been approved by the court, following the plaintiff's testimony that she understood and approved the terms. In the subsequent legal malpractice action, she claimed she was not truly satisfied with the settlement and her attorney had settled it without her consent, despite her testimony on the record. The plaintiff alleged she was "forced" to lie to the court about her acceptance of the settlement due to her attorney's alleged malpractice. In dismissing the malpractice action on the basis of judicial estoppel, the Court stated:
[The plaintiff] asserts that she never really meant to approve the settlement, and that she always intended to file this legal malpractice action. Judicial estoppel, with its attendant policies, is tailor-made to prevent just such a tactic, and to block the "secret or subjective intent" of the litigant. The sanctity of court proceedings is something that cannot be trifled with, nor will we permit a party to play fast and loose with the courts. To allow [plaintiff's] argument that [her attorney's] alleged malpractice "forced" her to lie in court, desecrates the sanctity of court proceedings, and impedes the administration of justice.
[Id. at 1228].
Similarly, in Broad v. Conway, 675 F.Supp. 768 (N.D.N.Y.1987), aff'd, 849 F.2d 1467 (2d Cir.1988), cert. denied, 488 U.S. 927, 109 S.Ct. 313, 102 L.Ed.2d 331 (1989), the federal District Court applied the doctrine of estoppel to dismiss the plaintiffs' legal malpractice claim where they voluntarily and unconditionally settled their underlying defamation action on *1157 the record and later alleged they were forced into accepting it. The court emphasized the policy basis behind this equitable doctrine:
[B]ecause the plaintiffs expressly stated on the record, in open court, that they were not coerced or influenced to settle, plaintiffs are precluded here from claiming that there is an issue of fact as to whether they voluntarily settled the underlying action.
. . . .
Under these circumstances, plaintiffs cannot now disavow the plain and unequivocal terms of the settlement, which they entered into voluntarily on the record, in open court. As defendants correctly noted, allowing plaintiffs to disavow a voluntary settlement made on the record in open court would "wreak havoc" with the judicial system. Not only would defense counsel be more reluctant to settle, out of fear that those settlements would later be set aside simply because plaintiffs changed their minds, but the attorney client relationship would also be undermined. Plaintiffs' attorneys would also be more reluctant to settle, because even if their clients agreed to a voluntary settlement, plaintiffs' counsel would be concerned that plaintiffs would sue them for malpractice at a later time.
[Id. at 772].
In Vogel v. Touhey, 151 Md.App. 682, 828 A.2d 268 (Md.Ct.Spec.App.), cert. denied, 378 Md. 617, 837 A.2d 927 (2003), the Maryland Court of Special Appeals utilized the doctrine of judicial estoppel to bar a client's legal malpractice claim based on failure to adequately perform in her underlying divorce action. The client, herself an attorney, had negotiated a property settlement agreement with her husband; thereafter she learned that her husband had failed to disclose substantial marital assets and diverted or dissipated other marital assets. She retained defendant attorney to challenge the agreement in the pending divorce action, uncover the full extent of the parties' marital assets and renegotiate a more beneficial property settlement agreement. Unhappy with the attorney's performance, she discharged him and a few days later settled her dispute with her husband for a fraction of the additional sum she had hoped to recover. The court held the client bound by her position in the divorce proceeding, noting that given the client's knowledge at the time of the divorce hearing that her attorney had failed to obtain and analyze certain of her husband's financial documents and she was not in a position to make an informed decision as to the settlement, she still represented to the master that she was fully aware of the issues and that the settlement was "fair and equitable." Id. at 716, 828 A.2d 268. Based on the extensive voir dire conducted by the master to establish that the settlement was a voluntary and knowing one, the court found the client's decision to settle her underlying matrimonial action to be a matter of her choice, not the product of duress or coercion. Ibid. The court dismissed her malpractice action, finding that she had created the circumstances that culminated in the claim and would derive an unfair advantage were she not estopped from asserting an inconsistent position in the malpractice action. Ibid.
Hudson's reliance on Ziegelheim v. Apollo, 128 N.J. 250, 607 A.2d 1298 (1992), and Puder v. Buechel, 362 N.J.Super. 479, 828 A.2d 957 (App.Div.2003), certif. granted, 180 N.J. 147, 849 A.2d 181 (2004), in support of her argument that the equitable doctrine of judicial estoppel was improperly invoked by the Law Division judge, is misplaced.
In Ziegelheim, the Court held that a client's acceptance of a negotiated matrimonial *1158 settlement did not bar her subsequent recovery from her attorney for the negligent handling of her divorce action. In that case, a plaintiff who had been married for thirty-five years retained defendant Stephen Apollo to represent her in a divorce action. During their meetings, she told him about all of the marital and separate assets of which she was aware, discussed her suspicion that her husband was either concealing or dissipating certain other assets, and requested he make a thorough inquiry into her husband's assets. She thereafter entered into a property settlement agreement which provided, among other terms, that she receive fourteen percent of the value of the marital estate as appraised by Apollo and the accountant. Id. at 257, 607 A.2d 1298. After the settlement was read into the record, both the plaintiff and her husband testified they understood the agreement, thought it was fair, and entered into it voluntarily. Ibid. Thereafter, she filed a malpractice action, asserting, among other claims, that she accepted the agreement only after Apollo advised her that wives in her position could expect to receive no more than ten to twenty percent of the marital estate if they went to trial, and she could expect to receive no more than twenty percent, which advice did not comport with that which a reasonably competent attorney would have given under the circumstances. Ibid.
The trial court granted summary judgment, noting that the client had stated on the record in the divorce action that she thought her agreement was "fair." Id. at 257-60, 607 A.2d 1298. We affirmed the dismissal of all but one of the five counts of the malpractice complaint. Id. at 260, 607 A.2d 1298.
The Supreme Court reversed and remanded the matter for trial on all counts of the complaint. Id. at 260-67, 607 A.2d 1298. The Court noted New Jersey's judicial policy encouraging settlements but declined to adopt the rule espoused by the Pennsylvania Supreme Court in Muhammad v. Strassburger, McKenna, Messer, Shilobod and Gutnick, 526 Pa. 541, 587 A.2d 1346, certif. denied, 502 U.S. 867, 112 S.Ct. 196, 116 L.Ed.2d 156 (1991), as urged by Apollo, barring a malpractice action against an attorney who negotiated a settlement accepted by the litigant in the absence of actual fraud on the part of the attorney. Ibid. Recognizing that litigants rely heavily on the professional advice of counsel when they decide whether to accept or reject offers of settlement, the Court found no reason to apply a more lenient rule to attorneys who negotiate settlements than it does to those who provide other legal services. Id. at 263-64, 607 A.2d 1298.
The Court further held that the plaintiff's statement on the record that the settlement agreement was fair and the Family Court's denial of her motion to set aside the agreement on that basis did not collaterally estop her from litigating her subsequent malpractice claim. Id. at 265-66, 607 A.2d 1298. The Court reasoned that "[t]he earlier ruling did not implicate the competence of counsel and, indeed, was premised on the presumptive competence of counsel." Id. at 266, 607 A.2d 1298. According to the Court, "[t]he fact that a party received a settlement that was `fair and equitable' does not necessarily mean that the party's attorney was competent or that the party would not have received a more favorable settlement had the party's incompetent attorney been competent." Id. at 265, 607 A.2d 1298.
Thus the plaintiff was permitted to maintain a legal malpractice action based on the proofs presented, which raised a genuine issue of material fact as to whether her matrimonial attorney gave deficient advice or inadequately investigated her *1159 husband's assets. The Supreme Court, however, was cautious that its decision in Ziegelheim not be read so broadly as to "open the door to malpractice suits by any and every dissatisfied party to a settlement," noting that "[m]any such claims could be averted if settlements were explained as a matter of record in open court in proceedings reflecting the understanding and assent of the parties." Id. at 267, 607 A.2d 1298. The Court further stated,
[P]laintiffs must allege particular facts in support of their claims of attorney incompetence and may not litigate complaints containing mere generalized assertions of malpractice. We are mindful that attorneys cannot be held liable simply because they are not successful in persuading an opposing party to accept certain terms. Similarly, we acknowledge that attorneys who pursue reasonable strategies in handling their cases and who render reasonable advice to their clients cannot be held liable for the failure of their strategies or for any unprofitable outcomes that result because their clients took their advice. The law demands that attorneys handle their cases with knowledge, skill, and diligence, but it does not demand that they be perfect or infallible, and it does not demand that they always secure optimum outcomes for their clients.
[Ibid.]
In Puder, supra, 362 N.J.Super. at 485, 828 A.2d 957, we held under Ziegelheim that the client was not precluded from pursuing a malpractice counterclaim against her matrimonial attorney who negotiated an oral settlement in the divorce action, which the client refused to formalize after having consulted another attorney who advised her the terms were unfavorable, merely because she entered into a new and slightly more favorable divorce settlement agreement while the malpractice action was pending. We focused on the allegation that the attorney negligently negotiated and recommended the settlement with only limited discovery of the husband's assets and, more significantly, settled the case even though the client accepted only "some but not all of the terms." Id. at 482, 828 A.2d 957. The client was then arguably placed in a "vulnerable" and "untenable" position in the enforcement action by reason of her former attorney's breach of duty, prompting her acceptance of the second settlement. Id. at 489-90, 828 A.2d 957. We also held that the trial court's invocation of judicial estoppel was error, but that was in the context of the malpractice counsel's certification with his motion for a stay stating that resolution of the matrimonial action would moot her malpractice counterclaim. Id. at 494-94, 828 A.2d 957. The basis for that ruling is not pertinent to the issues before us.
In Ziegelheim and Puder, the courts recognized legal malpractice as a viable cause of action where a matrimonial attorney's negligent pretrial preparation and advice led to the recommendation of an improper settlement. By declining to apply a per se bar, these cases preserve a malpractice claim of a vulnerable litigant who unknowingly enters into an inadequate settlement, believing it is fair, as a result of the arguable negligence of her matrimonial attorney. These cases, however, do not bestow special protection or immunity from the doctrine of judicial estoppel on a litigant such as Hudson who claims to have perjured herself to obtain judicial approval of her marital settlement agreement in order to maintain a subsequent legal malpractice counterclaim. The case before us is factually inapposite and has none of the policy considerations inherent in Ziegelheim and Puder.
As the Supreme Court of Idaho recognized,

*1160 For guidance purposes and to avoid misapplication of judicial estoppel, it should be made clear that the concept should only be applied when the party maintaining the inconsistent position did have, or was chargeable with, full knowledge of the attendant facts prior to adopting the initial position. Stated another way, the concept of judicial estoppel takes into account not only what a party states under oath in open court, but also what that party knew, or should have known, at the time the original position was adopted. Thus, the knowledge that the party possesses, or should have possessed, at the time the statement is made is determinative as to whether the person is playing "fast and loose" with the court.
[McKay v. Owens, supra, 937 P.2d at 1229.]
Mrs. Ziegelheim accepted a property settlement agreement believing it to be fair and reasonable based on the advice of her attorney and truthfully testified as such to the court. It was only later that she learned that her attorney's advice was arguably erroneous and the settlement inadequate. In contrast, according to Hudson's deposition testimony, she knew at the time she entered into the interspousal agreement that it was unfair, she was forced to enter into it, she was dissatisfied with her attorney, he did not answer her questions or properly explain the law, and she knew the settlement would not permit her to maintain her marital standard of living. Hudson chose, however, to testify under oath, in open court, in elaborate detail to the contrary.
Newell, the adversarial party and his counsel and, most significantly, Judge Locascio relied on Hudson's sworn statements regarding settlement of her matrimonial action. Following hours of negotiations on the trial date, Newell relied on his client's representations to him prior to signing the agreement that she understood her legal rights, particularly with regard to alimony; that he had fully explained all of the provisions to her satisfaction; and that she was voluntarily accepting the terms as an alternative to trial. Accordingly, he permitted her to sign the agreement and proceeded with the settlement in open court. By signing the agreement, Hudson again affirmed the truth of her representations. Hudson's then-husband and his attorney also relied on the truthfulness of her answers that an agreement had been voluntarily reached between the parties which, absent husband having withheld information (of which there was no evidence), would withstand challenge.
Judge Locascio then conducted an exhaustive question and answer session of the parties under oath on the record, in accordance with the directives of Stout,[4]Crews,[5] and Ziegelheim.[6] Counsel and the court elicited specific testimony from Hudson regarding the base points, term and amount of alimony, Crews prerequisites, and her voluntary understanding and assent to all of the terms of the agreement. In reliance upon Hudson's representations, the Family Part judge approved the parties' settlement and entered a final judgment of divorce incorporating its terms. See Cummings v. Bahr, 295 N.J.Super. 374, 375-376, 685 A.2d 60 (App.Div.1996) (concluding that a position has been "successfully asserted" in the context of applying *1161 judicial estoppel it if has helped form the basis of a judicial determination).
This is not a case where the litigant was misinformed of the criteria to be employed or was without full knowledge of the attendant facts prior to adopting her initial position. Contrary to Hudson's assertion, her profession was a relevant consideration by Judge Quinn in invoking the principle of judicial estoppel. Hudson is an accountant by education who performs internal auditing for a corporation; she was not an unsophisticated individual or a vulnerable litigant. It is clear from the record of the divorce proceeding that Hudson was fully familiar with the financial circumstances of the parties, and the regularity of her husband's bonuses and total income, and waived her right to further discovery. Hudson was unable to point to any income or assets that had not been disclosed at the time of the divorce. Moreover, the agreement was presumptively fair; as Judge Locascio noted, Hudson's alimony settlement was more than the pendente lite award and more than her expenses reflected in her case information statement.
In order for Hudson to subsequently pursue this malpractice action, she had to disavow her prior contradictory sworn testimony before Judge Locascio. She now claims she testified falsely in the prior action in order to mislead both the court and her counsel, neither of whom would have permitted the settlement agreement to be accepted had she offered the contradictory testimony set forth in her deposition. It is immaterial whether Hudson either deliberately lied in the matrimonial action or in the malpractice action; her statements are clearly inconsistent and uttered to obtain judicial advantage.
We agree with Judge Quinn's summary disposition. Hudson's acknowledgements during the voir dire of her divorce settlement bar her inconsistent statements in the malpractice action. Thus Hudson's claim of legal malpractice is barred as a matter of law. If she was honest in the first proceeding and simply changed her mind after the settlement was placed on the record, there was no professional malpractice by Newell. If she intentionally misrepresented in the matrimonial action with secret intent to obtain judicial approval of the agreement and a divorce, as she now claims she did, she is subject to judicial estoppel of her legal malpractice claim. Hudson's self-serving behavior is precisely the type of inconsistent judicial position-taking that the doctrine of judicial estoppel is designed to prevent. To permit this litigant to assert a contrary position in the malpractice action presumably to bolster her counterclaim in an effort to defeat Newell's legitimate claim for counsel fees would result in a miscarriage of justice and impugn the integrity of the judicial process. Kimball Int'l, Inc. v. Northfield Metal Prods., 334 N.J.Super. 596, 606-608, 760 A.2d 794 (App.Div.2000), certif. denied, 167 N.J. 88, 769 A.2d 1051 (2001).
Even though Judge Quinn need not have addressed Hudson's expert reports in view of his ruling on judicial estoppel, he nonetheless did consider both the attorney's report and the untimely report of the accountant and entertained oral argument on the significance of the reports. The judge commented on the reports in his decision, including his assessment that the report of plaintiff's legal expert "tends to help the other side as opposed to helping [her]." He gave no credence to the reports, which were purely speculative and contained net opinions, and properly concluded there was no evidence of malpractice on the part of Newell that would preclude the granting of summary judgment in his favor. We reject Hudson's argument that she and her expert witnesses presented sufficient credible proof of Newell's malpractice to withstand summary judgment on her malpractice *1162 counterclaim or Newell's affirmative action for fees. R. 2:11-3(e)(1)(E).
Affirmed.
NOTES
[1] Adubato's name is misspelled in the caption.
[2] Respondent represents in his appellate brief that in December 2000, the Matrimonial Early Settlement Panel (MESP) recommended limited duration alimony of $4000 per month for three years. The settlement agreement provided for the same gross amount, varying the monthly amount and extending the years to four. We note this for informational purposes only, recognizing that a settlement is not evidentiary and Hudson was under no obligation to accept the MESP panel's recommendation. See Rule 5:5-5 regarding mandatory participation in Matrimonial Early Settlement Programs.
[3] Hudson's counsel conceded at oral argument that his client did not allege any impropriety associated with the equitable distribution.
[4] Stout v. Stout, supra, 155 N.J.Super. 196, 382 A.2d 659.
[5] Crews v. Crews, supra, 164 N.J. ll, 751 A.2d 524.
[6] Ziegelheim v. Apollo, supra, 128 N.J. 250, 607 A.2d 1298.