**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1048-20

IN THE MATTER OF THE
LICENSE OF JAMES K.
JOHNSTON, P.E., P.P. LICENSE
NO. 24GE03527300 TO PRACTICE
AS A PROFESSIONAL ENGINEER
IN THE STATE OF NEW JERSEY.

_____

Argued October 12, 2021 – Decided December 27, 2021

Before Judges Sabatino and Rothstadt.

On appeal from the New Jersey State Board of Professional Engineers and Land Surveyors, Division of Consumer Affairs, Department of Law and Public Safety.

Donald R. Belsole argued the cause for appellant James K. Johnston (Belsole and Kurnos, LLC, attorneys; Donald R. Belsole and Kevin Weinman, on the briefs).

Daniel Hewitt, Deputy Attorney General, argued the cause for respondent New Jersey State Board of Professional Engineers and Land Surveyors (Andrew J. Bruck, Acting Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Daniel Hewitt, on the brief).

PER CURIAM

James K. Johnston appeals from the November 10, 2020 thirty-three page, final decision and order of the State Board of Professional Engineers and Land Surveyors (the Board), revoking his license to practice as a professional engineer in the State of New Jersey, but permitting him to reapply for a license five years later. In revoking Johnston's license, the Board relied on his criminal conviction for making illegal campaign contributions,[1] which the Board concluded, and the parties agreed, was a crime "relating adversely to the practice of engineering" under N.J.S.A. 45:1-21.[2] On appeal, Johnston contends the revocation was unreasonable and that the Board failed to "adequately consider

---

[1] On April 12, 2017, Johnston pled guilty to the fourth-degree offense of making campaign contributions to persons running for public office in the State of New Jersey, N.J.S.A. 19:44A-20.1. During his plea hearing, he testified he was employed as an officer at the Birdsall Services Group (Birdsall), where, as part of his compensation, the corporation paid him bonuses that he was then instructed to use to make political campaign contributions. The court sentenced Johnston to two years' probation, conditioned upon 270 days incarceration and forfeiture of $93,720, and barred him from submitting a bid, entering a contract, or conducting any business with any branch of government in the state.

[2] The statute was amended on May 11, 2021, with an effective date of August 9, 2021, to require the conviction to have "a direct or substantial relationship to the activity regulated by the Board or is of a nature such that certification, registration or licensure of the person would be inconsistent with the public's health, safety, or welfare." L. 2021, c. 81, §1. We apply the statute as it read at the time of the Board's determination.

A-1048-20

all mitigating circumstances and evidence."  We disagree and affirm, substantially for the reasons stated by the Board in its written decision.

The matter came before the Board after the Attorney General filed a complaint with it, seeking to revoke Johnston's license based upon his criminal conviction.  In response, Johnston conceded his criminal conviction was adversely related to his practice of engineering, but he asserted the affirmative defense of laches, arguing seven years had passed since his indictment and three years since entering his guilty plea.  He also argued the undue delay in filing the complaint to revoke his license in addition to the renewal of his license during those intervening years gave him "a false sense of security that everything was concluded and behind him."

The Board considered the matter on October 15, 2020, at a hearing where Johnston testified, documentary evidence was submitted, and the parties presented oral argument.[3]  Thereafter, the Board issued an oral decision at the

---

[3]  A complaint to revoke Johnston's license was also filed by the Attorney General with the State Board of Professional Planners.  The parties agreed to consolidate the hearings before the two professional boards.  While the hearing was held jointly, the Board noted in its opinion that "each Board deliberated separately during the liability and penalty phases to make its own determinations."  The record before us does not contain an opinion or order from the Board of Professional Planners, and according to Johnston's notice of appeal, he is appealing only the Board's decision.

A-1048-20

conclusion of the hearing and then issued its written decision and order on November 10, 2020.

In its written decision, the Board concluded Johnston's argument about undue delay was without merit, and, therefore, denied a motion he had made to dismiss based on his affirmative defense.[4]  As to the delay, the Board agreed with the Attorney General that there was a need to wait until the criminal proceeding was complete before moving forward to revoke his license, which it viewed as a "common practice."  Further, "[t]he Board [found] that the three-year timeframe between [Johnston's] criminal conviction until the filing of the complaint in no way prejudiced" him because the "delay during this time was in part due to [his] participation in settlement negotiations" with the Board, which were unsuccessful.

---

[4]  While the matter was pending before the Board, Johnston filed a motion to delay the proceeding, arguing that the Board failed to have a quorum when only five members of the Board out of the seven current members were in attendance (three member seats were vacant at the time and two members had to recuse themselves from the proceeding).  The Board determined, pursuant to N.J.S.A. 45:1-2.2(d), the statute required a majority of the currently seated members to participate, which was four, and, thus, a quorum was met.

The Board then addressed whether Johnston's conviction met the criteria under N.J.S.A. 45:1-21(f),[5] and noted both parties had "already agreed that the criminal conviction constitute[d] a crime relating adversely to the practice of engineering." While the Attorney General argued Johnston's conviction was also a crime involving moral turpitude, the Board determined that was an unnecessary finding "as the statutory predicate for the suspension or revocation of a license is fully satisfied upon a finding of a conviction of a crime relating adversely to the practice of engineering" alone.

---

[5] N.J.S.A. 45:1-21(f), as it existed before August 2021, read in pertinent part as follows:

> A board may refuse to admit a person to an examination or may refuse to issue or may suspend or revoke any certificate, registration or license issued by the board upon proof that the applicant or holder of such certificate, registration or license:
>
> . . . .
>
> f. Has been convicted of, or engaged in acts constituting, any crime or offense involving moral turpitude or relating adversely to the activity regulated by the board. For the purpose of this subsection a judgment of conviction or a plea of guilty, non vult, nolo contendere or any other such disposition of alleged criminal activity shall be deemed a conviction.

A-1048-20

When determining the penalty to be imposed, the Board considered: letters and character references submitted on Johnston's behalf, his testimony to the Board, other Board cases that Johnston's counsel presented to distinguish this case from others, the parties' oral arguments, and the Board's decisions about the discipline imposed on others in the Birdsall criminal matter that resulted in revocation of licenses. After highlighting its position that it considered this to be a very serious crime, the Board revoked Johnston's license, but permitted him to reapply for licensure after five years. It also assessed the costs incurred to litigate this proceeding, in the amount of $5,640.18. This appeal followed.

Our "review of agency determinations is limited." Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (citations omitted). "An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Ibid. (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)).

In reviewing the agency's decision, we consider:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly

6

erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Ibid. (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).]

In our review we "must be mindful of, and deferential to, the agency's 'expertise and superior knowledge of a particular field.'" Id. at 158 (quoting Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009)). We "may not substitute [our] own judgment for the agency's, even though [we] might have reached a different result." Ibid. (quoting Stallworth, 208 N.J. at 194). However, we are "in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue." Ibid. (alteration in original) (quoting Div. Youth & Fam. Servs. v. T.B., 207 N.J. 294, 302 (2011)). On any challenge to any decision, the burden of proof lies with the party challenging the agency decision. A.M. v. Monmouth Cnty. Bd. of Soc. Servs., 466 N.J. Super. 557, 565 (App. Div. 2021).

With those guiding principles in mind, we begin by addressing Johnston's contention that the Board acted outside its authority when it imposed sanctions after determining Johnston's actions that led to the conviction "cast[ed] a stain upon the profession and [shook] the public's trust." According to Johnston, "it does not appear the Board is broadly charged in guarding the public trust." Also,

and contrary to his concession before the Board, on appeal he argues his conduct was not related to his professional license. We disagree.

When considering whether to revoke a professional license, the Board is required to follow the Uniform Enforcement Act (Act), N.J.S.A. 45:1-14 to -27. In its adoption of the Act, the Legislature determined "uniform investigative and enforcement powers and procedures and uniform standards for license revocation, suspension and other disciplinary proceedings by [professional and occupational boards within the Division of Consumer Affairs]" were required to best protect the public.[6] N.J.S.A. 45:1-14. Under the Act, the Board is permitted to revoke a license given to someone who "[h]as been convicted of, or engaged in acts constituting, any crime or offense involving moral turpitude or relating adversely to the activity regulated by the [B]oard." N.J.S.A. 45:1-21(f) (adding that a plea of guilty is deemed a conviction). Also, the Board's purpose is "to safeguard life, health and property, and promote the public welfare." N.J.S.A. 45:8-27. In pursuit of that goal, "any person practicing or offering to practice professional engineering or professional land surveying in this State [is]

_____

[6] N.J.S.A. 45:1-15 provides that the State Board of Professional Engineers and Land Surveyors is subject to this Act.

required to submit evidence [to the Board] that he is qualified so to practice." Ibid.

Therefore, "[l]icenses to practice professional engineering . . . are required as a matter of public policy." Hyland v. Ponzio, 159 N.J. Super. 233, 237 (App. Div. 1978). When construing the statute liberally "in order to effect the declared or clearly implied purposes of which it was enacted," id. at 238, guarding the public trust is very much within the Board's authority.

As to Johnston's belated contention that his conviction did not relate to his professional license, we conclude his contention is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We only note again that Johnston earlier conceded his conviction adversely related to the profession, and he cannot now alter that stance. See Newell v. Hudson, 376 N.J. Super. 29, 38 (App. Div. 2005) (stating parties are prohibited "from asserting a position in a case that contradicts or is inconsistent with a position previously asserted by the party in the case or a related legal proceeding"). Even if he was allowed to do so, we have no doubt that his conduct directly and adversely related to his profession.

Having considered Johnston's crime warranted discipline, we next consider his argument that the revocation of his license and the five-year

moratorium on reapplication was "disproportionate and unfair and should shock the conscious of the [c]ourt." He contends it was improper for the Board to have "assess[ed] all of the Birdsall licensees in the same light due to their involvement in the reimbursement scheme" because the Board "ignore[d] the record of how [he] came to be involved in the Birdsall scheme, the nature of his involvement, and the crucial differences in how the criminal matters were resolved."[7] Johnston also claims the Board failed to follow the Act, which "intend[s] to provide uniformity in the investigative and enforcement powers of all professional boards," as demonstrated by the "wide margin" that exists between the sanctions imposed against him as compared to other cases. We disagree.

Our review of an agency's sanction is also limited. "A reviewing court should alter a sanction imposed by an administrative agency only 'when necessary to bring the agency's action into conformity with its delegated authority.'" In re Hermann, 192 N.J. 19, 28 (2007) (quoting In re Polk, 90 N.J. 550, 578 (1982)). "[T]he test [for] reviewing administrative sanctions is 'whether such punishment is "so disproportionate to the offense, in the light of

---

[7] Johnston also implies his punishment should be evaluated in light of the fact that he committed only a fourth-degree crime. He does not provide any case law to support why the degree of the crime should be factored into the Board's decision nor does the statute make any distinction between the degree of the crime committed, it simply states "convicted of a crime." N.J.S.A. 45:1-21(f).

all the circumstances, as to be shocking to one's sense of fairness."'" Polk, 90 N.J. at 578 (quoting Pell v. Bd. of Educ., 313 N.E.2d 321, 326 (N.Y. 1974)).

Here, Johnston was criminally convicted for participating in a scheme to violate New Jersey's pay-to-play laws[8] by accepting extra bonuses from his company and in turn writing personal checks as campaign contributions to various public officials' campaigns over a span of five years, in violation of N.J.S.A. 19:44A-20.1. He testified at the hearing before the Board that he was approached about six months after he started working as an officer at Birdsall to partake in the scheme. At that time, he immediately questioned if the plan to receive bonuses for the payment of political contributions was legal. He was told by the individual who approached him that it was, and Johnston did not question it further. He also testified he did not receive any personal benefit.

The Board considered the written and oral arguments of both parties as well as Johnston's testimony when determining the penalty it would impose. The Board made credibility determinations and found credible Johnston's testimony regarding how he began to participate in the scheme, but found his testimony that he did not benefit and was unaware of the benefit to the company not

---

[8] See N.J.S.A. 19:44A-20.3 to -20.25.

credible.[9]  Although the Board considered Johnston's otherwise unblemished, distinguished career as an engineer, as well as his post-conviction voluntary efforts to rehabilitate himself and provide services to the profession and his community, it determined those positive attributes were outweighed by the fact that after Johnston raised an initial concern about the legality of the contributions, he continued to voluntarily participate in the scheme for five years and stopped only due to law enforcement intervention.  The Board found Johnston's "criminal conviction, and his corrupt acts giving rise to it, to be extremely serious and clearly not the conduct expected of a professional engineer."  It concluded "that [Johnston's] criminal conviction, and even more fundamentally the actions upon which that conviction was predicated, are antithetical to the standards we expect of all licensed engineers, and at their core fundamentally adverse to the practice of engineering."

---

[9]  The Board found, prior to working at Birdsall, Johnston spent years building up his own engineering firm, PMK, which had its own designated employee to handle pay-to-play laws within the firm.  That employee remained with Birdsall after the merger with PMK.  Having then-held an engineering license for approximately thirty years, ten of which spent as a principal of his own engineering firm, the Board believed he was more than aware of the pay-to-play laws and the benefits Birdsall and, consequentially, he gained through his criminal acts.

12

It disregarded Johnston's comparisons to other disciplinary cases before the Board to support his contention that his case was unlike the other Birdsall matters and more like two other revocation cases not involving pay-to-play violations.[10]  Instead, the Board focused on other licensed engineers participating in the same scheme and noted each surrendered his license, which was the equivalent to a permeant revocation.[11]  However, and despite the Attorney General's request for a permanent revocation of Johnston's license, the Board felt a revocation with only a five-year bar on reapplication struck a fair balance between Johnston's conduct and the presented mitigating factors.

We conclude from our review of the record that Johnston has not carried his burden to establish his sanction imposed by the Board was so disproportionate or shocking to justify our intervention.

---

[10]  In his merits brief to this court, Johnston provides background on a few cases brought before various state boards, including the Board of Chiropractic Examiners, Board of Medical Examiners, and Board of Professional Engineers and Land Surveyors.  The purpose of these comparisons was to support his claim that others, in his view, performed worse acts and yet obtained lighter sentences against their respective licenses.

[11]  At oral argument before us, Johnston contended the most culpable of participants in the Birdsall scheme did not yet receive any sanction from the Board.  The Deputy Attorney General confirmed as of that date no action had yet been taken to address that individual's license.  He also confirmed Johnston could seek reconsideration of his revocation if that individual receives a lesser sanction.

We find no merit to Johnston's unsupported argument that the Board should not have considered the penalties imposed on the other Birdsall pay-to-play scheme members when determining his penalty, but rather it should have compared his punishment to penalties imposed under the Act, which he contends demonstrate that his penalty was disproportionally harsh.  This is a similar argument made in In re Zahl, where the Supreme Court reversed our remanding a matter to the Board of Medical Examiners after we determined the license revocation for Zahl's dishonest behavior was too harsh where no patients were actually harmed.  186 N.J. 341, 343 (2006).  The Supreme Court reversed and remanded to the Board to revoke the license, determining the agency acted within its authority to revoke the license where dishonesty falls under N.J.S.A. 45:1-21.  Id. at 354.  In doing so, the Court emphasized its decision in Polk that an appellate court should not overrule an agency on its sanction decision simply because it would have come to a different result.  See ibid. (quoting Polk, 90 N.J. at 578).

Here, the Board performed a thorough review of the evidence before it and decided the matter based on its "expertise and superior knowledge of [its] particular field."  Allstars Auto, 234 N.J. at 158 (quoting Circus Liquors, 199

N.J. at 10). Because the Board acted within its authority, we have no reason to disturb its decision.

To the extent we have not specifically addressed any of Johnston's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION