**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0503-16T2

IN THE MATTER OF THE SUSPENSION
OR REVOCATION OF THE LICENSE OF

    JOHN L. HOCHBERG, M.D.,
    LICENSE NO. 25MA04163600

TO PRACTICE MEDICINE AND SURGERY
IN THE STATE OF NEW JERSEY.

_____

Submitted April 24, 2018 — Decided July 31, 2018

Before Judges Reisner, Hoffman, and Gilson.

On appeal from the New Jersey Board of Medical
Examiners.

Stephen A. Gravatt, attorney for appellant
John L. Hochberg, M.D

Gurbir S. Grewal, Attorney General, attorney
for respondent New Jersey Board of Medical
Examiners (Andrea M. Silkowitz, Assistant
Attorney General, of counsel; Kathy S.
Mendoza, Deputy Attorney General, on the
brief).

PER CURIAM

    Dr. John L. Hochberg appeals from a July 25, 2016 final decision and order issued by the Board of Medical Examiners, and from an August 25, 2016 supplemental order. In its July 25, 2016

decision, the Board found that Hochberg committed record-keeping violations, and acts of negligence and gross negligence with respect to two private patients, B.L. and K.O., whom he was treating for chronic pain. See N.J.S.A. 45:1-21(c) and (d) (authorizing license suspension for gross negligence or repeated acts of negligence); N.J.A.C. 13:35-7.6 (setting forth required procedures for prescribing controlled dangerous substances); N.J.A.C. 13:35-6.5 (requiring documentation of patient treatment information). The Board also found that Hochberg committed gross negligence in the treatment of N.D.B., an inmate at a prison where Hochberg was the medical director.[1]

In the July 25, 2016 decision, the Board imposed a $60,000 penalty and suspended Hochberg's medical license for five years; the first two years are an active suspension and the last three years may be stayed and served as probation. In the August 25, 2016 order, the Board also assessed approximately $350,000 in counsel fees and costs. Hochberg did not claim that he could not pay the assessed amounts, which the Board allowed him to pay in installments over a period of four years.

---

[1] The Board also found that Hochberg committed gross negligence and recordkeeping violations with respect to several additional private patients, including prescribing opioid pain medications without keeping proper patient records. However, he is not appealing the findings with respect to those patients.

The majority of Hochberg's appeal from the July 25, 2016 decision focuses on the Board's findings concerning N.D.B., who died in prison while Hochberg was responsible for overseeing his medical care. Hochberg contends that the Board should have deferred to the administrative law judge's (ALJ's) determination that Hochberg did not deviate from the standard of care, in failing to order a blood transfusion for N.D.B. after his hemoglobin dropped to a "dangerously low" level. Hochberg also contends that the Board's factual findings about the need for the transfusion were not supported by substantial credible evidence. He argues that both the ALJ and the Board erred in finding gross negligence in Hochberg's failure to order a reevaluation of the inmate's psychiatric medication, amitriptyline (Elavil), to ensure that the inmate's severe symptoms were not due to an overdose of the medication.

In a point consisting of half a page, Hochberg also contends that the Board erred in concluding that Hochberg did not actually provide certain medical services to two private patients, B.L. and K.O. Those findings were based on Hochberg's failure to document such services in the patients' records and his failure to offer

any witness testimony that he provided the services.[2]  Lastly, Hochberg contends that the sanctions, penalties, costs, and fees the Board imposed were excessive and an abuse of discretion.

After reviewing the record in light of the applicable legal standards, we conclude that the Board's decision was supported by substantial credible evidence, and the Board properly employed its medical expertise in evaluating the expert testimony.  Hochberg's argument concerning B.L. and K.O. is without sufficient merit to warrant further discussion, and as to those two patients, we affirm for the reasons stated in the Board's decision.  R. 2:11-3(e)(1)(E).  We find no abuse of discretion or shocking unfairness in the sanctions, penalties, costs, and fees imposed. Accordingly, we affirm both of the Board's decisions on appeal.

I

Before addressing the legal issues concerning N.D.B., we summarize the medical evidence and expert testimony concerning Hochberg's treatment of this patient.

Hochberg was the site medical director for Northern State Prison, where N.D.B. was incarcerated.  He was responsible for all medical care provided to that prison's inmates.  All physicians

---

[2] Hochberg does not challenge the ALJ's or the Board's findings that he committed multiple other violations with respect to K.O. and B.L.

and nurses involved in the medical care of those inmates had full access to their electronic medical records, which included orders and notes.

Manuel Garcia, a psychiatrist at the prison, testified that he began treating N.D.B. in 2007 for depression, personality disorder, and a substance abuse disorder. Garcia prescribed amitriptyline, also known as Elavil, which N.D.B. was receiving during the entire period at issue. Garcia believed that N.D.B. had a high tolerance for Elavil and in the fall of 2008, he substantially increased N.D.B.'s dosage.

In addition to his psychological problems, N.D.B. had Hepatitis C. In October 2008, Hochberg prescribed treatment for the Hepatitis C, consisting of a series of twelve injections of the anti-viral drugs Pegasys and Ribavirin. Decreased hemoglobin levels was an expected side effect, so N.D.B.'s hemoglobin level was to be tested every two weeks. Hemoglobin levels are reported in grams per deciliter; the normal range is 12.5 to 17. At the start of treatment, N.D.B.'s hemoglobin level was 15.4.

After N.D.B.'s third injection on November 12, 2008, his hemoglobin level decreased to 11.2. Hochberg's treatment notes did not record the decrease in hemoglobin, but indicated that the viral load of Hepatitis C had dropped significantly and that the injections would continue.

On November 26, 2008, after N.D.B. received his fifth injection, he told Richard Mucowski, a prison psychologist who was conducting a routine follow-up visit, that he wanted to stay in bed. N.D.B. described symptoms evocative of flu and depression, which were typical for his course of treatment for Hepatitis C.

On December 3, 2008, just before N.D.B. received his sixth injection, he told Mucowski that he had flu-like symptoms and was discouraged, "feeling like he's been beaten up" and mildly depressed. On December 5, 2008, Dr. Hochberg noted that N.D.B.'s hemoglobin level was 9.9.

On December 10, 2008, Garcia saw N.D.B. He noted that N.D.B. had a dependency mentality and persistently demanded "sedation." On that date, N.D.B. told Garcia that he needed Elavil because the Pegasys was deepening his depression. Garcia re-ordered the prescription for Elavil.

Later that same day, N.D.B. received the seventh injection of anti-viral medication. For unknown reasons, no lab test for hemoglobin was ordered after that injection or the next three.

On December 19, 2008, after the eighth injection, Dr. John Godinsky, another prison physician, visited N.D.B. Godinsky noted that he discussed "abnormal labs" with N.D.B., but that "all treatments" would continue. On December 24, 2008, after the ninth

injection, Mucowski visited N.D.B. and noted his complaint of dizzy spells since starting the Hepatitis C treatment.

On December 31, 2008, the day of the tenth injection, N.D.B. complained again of dizziness, and also about shortness of breath, tightened muscles, and chest pain. Dr. Narsimha Reddy visited him, noted that the symptoms "subsided spontaneously," and did not order any changes.

N.D.B.'s eleventh injection was administered on January 7, 2009, and a lab test was ordered on January 12, 2009. The hemoglobin result was 6.4, which Godinsky called "low." Godinsky requested a consultation with Dr. Husain, an infectious disease specialist, to "evaluate anemia secondary to" Hepatitis C treatment.

Godinsky also ordered a repeat lab test and wrote that he intended to order Epogen, also known as Aranesp or erythropoietin, if N.D.B.'s hemoglobin level was low again. Epogen counters anemia by stimulating the production of red blood cells.

Despite his note implying an intention to wait for the next lab test, on January 13, 2009, Godinsky ordered the administration of Epogen. On that same day, N.D.B. was admitted to the prison infirmary, because he had become dizzy and light-headed. Nurse Nadia Jean Pierre noted that N.D.B. was "stable and ambulatory"

A-0503-16T2

upon admission and had "no acute distress," although he was pale and slightly weak.

When nurse Ogundana arrived for her overnight shift starting on January 13, 2009, N.D.B. was sleeping. At 4:00 a.m. on January 14, during a routine check for vital signs, he was easily aroused from sleep, and he had no complaints or acute distress, although he looked "ashen."

On January 14, 2009, Hochberg asked for a psychiatrist or psychologist to see N.D.B. because the Hepatitis C treatment might aggravate "his bipolar problems," although nothing in N.D.B.'s records documented a bipolar condition. Garcia and Hochberg visited N.D.B. together. Garcia noted that N.D.B. was very pale and complaining of "passing episodes of dizziness." Garcia testified that Hochberg called N.D.B.'s anemia "marked." Garcia testified that he was not concerned that the dose of Elavil might be excessive, because he believed that N.D.B. had a high tolerance for it, and because N.D.B. was alert, oriented, not confused, and his mouth was not dry.

A January 14, 2009 lab report indicated that N.D.B.'s hemoglobin level had dropped to 5.1. On January 15, 2009, Hochberg saw N.D.B. and noted the new hemoglobin level of 5.1, as well as a lower white blood cell and platelet count. Nonetheless, Hochberg assessed the patient as "clinically sound." He noted, however,

that the twelfth and final injection for Hepatitis C was on hold. The eleventh injection had been administered eight days earlier. Hochberg also noted that Epogen had been prescribed for the patient.

On January 16, 2009, a Friday, Hochberg saw N.D.B. and noted the absence of acute distress. However, that afternoon, infectious disease nurse Margaret Ukpuno noted that N.D.B. complained of dizziness after taking a shower, and noted that the staff encouraged him to stay in bed. Ukpuno informed Dr. Husain, the consulting infectious disease specialist, about N.D.B.'s hemoglobin level of 5.1. Husain responded by recommending lab tests every two or three days until the hemoglobin stabilized at about 7 to 8, then weekly until it increased to about 10, and then monthly until it was normal. Ukpuno "flagged" Husain's response for Hochberg's attention. Hochberg would later countersign it on Tuesday, January 20, 2009.

From January 16 to January 20, 2009, the patient appeared pale, and he had some dizziness and low blood pressure. On January 20, during rounds before the end of her overnight shift, nurse Ogundana found N.D.B. sitting up in bed. He was pale and had a slight bruise on the bridge of his nose. He reported that he had fallen, and that his hands were so shaky that he was dropping everything. She saw juice and coffee on the sheets and the floor.

9

She asked N.B.D. to extend his hands, and they shook. He had been served breakfast in his cell, because he felt weak and the infirmary staff did not want to risk a fall.

Hochberg saw N.D.B. that same day and found him to be pale, but alert and stable, oriented, and in no distress. He noted that N.D.B.'s hemoglobin had dropped to 4.3, and that the Hepatitis C viral load was undetectable. Hochberg sent an e-mail to Yasser Soliman, the Director of Utilization Management, stating that if N.D.B.'s hemoglobin level dropped any lower and if N.D.B. became "symptomatic," he would need a transfusion "this weekend." Hochberg added that N.D.B. "may have fallen as a result of his anemia, but seems stable."

On January 21, 2009, at 6:15 a.m., Ogundana noted that N.D.B. was unkempt and dirty, with juice "all over his clothing." He walked with a broad stance and swung from side to side as if he were going to fall, so he was instructed to remain in bed. He was not oriented to time, because he had awakened at midnight and asked for breakfast. He was told the time, but five minutes later he said he needed a wheelchair because he could not walk far without falling and he wanted to go to breakfast.

At 8:39 a.m. on January 21, Hochberg saw N.D.B. and considered him oriented. He also received Dr. Husain's consultation note. Husain referenced the hemoglobin levels of 5.1 and 4.3 and

confirmed that N.D.B.'s treatment with the anti-viral drugs should be suspended.

Also, on January 21, Soliman responded to Hochberg's e-mail by advising him that a request for transfusion would have to be made promptly if N.D.B. were to be scheduled for outpatient transfusion on Friday, January 23, 2009. Hochberg replied that he would try "Aranesp" (Epogen), and stated that if N.D.B.'s hemoglobin level did not improve "by Friday or perhaps Monday," he would send N.D.B. for an outpatient transfusion.[3] Soliman replied that transfusions had to be scheduled on Fridays, and that requests took a few days to process. Hochberg responded that he would make the request the next day if the stat lab test results that he was awaiting warranted it. Later that day, Hochberg received the lab report, stating N.D.B.'s hemoglobin level as 4.5. Hochberg noted that as a "mild gain."

That afternoon, two nurses responded after N.D.B. slipped and fell. His vital signs were normal. Hochberg put N.D.B. on "fall precaution" status.

---

[3] The record does not explain why Aranesp would first be "tried" on January 21, 2009, eight days after Godinsky had prescribed Epogen and seven days after Hochberg ordered the patient to "start" taking Epogen.

A-0503-16T2

On January 22, 2009, at 6:56 a.m., Ogundana noted that N.D.B. was easily arousable and had no complaints. On January 23, 2009, at 7:23 a.m., Ogundana noted that N.D.B. had no acute distress, but his speech was mumbled and incoherent. Ogundana testified that N.D.B. commented that he did not know what he was saying. Ogundana added that, sometime after midnight, N.D.B. was in his wheelchair and getting ready for breakfast. That was the third instance of such confused behavior, and N.D.B. told her that he did not always know what time it was. However, Ogundana testified that she did not see anything during her shift that suggested a need to call a doctor.

Hochberg saw N.D.B. at 8:39 a.m. on January 23, 2009. His notes mentioned anemia, but also stated that the hemoglobin level appeared to be rising, an apparent reference to the increase from 4.3 to 4.5. Hochberg noted that this meant the patient's blood tests no longer needed to be sent to the lab on a "stat" basis. Hochberg also noted that he intended to keep N.D.B. in the infirmary until his hemoglobin level reached 8.

During the afternoon of Friday, January 23, 2009, nurse Dorothy Okeke recorded N.D.B.'s blood pressure as 126/74, pulse rate at 76, and pulse oxygen saturation at 97. N.D.B. was sleeping in bed, but during rounds he had been arousable and verbally responsive. He complained that his hand was shaking and causing

him to drop his juice and food. N.D.B. also complained of muscle weakness and fainting, and he had been "seen on [the] floor."

At some point during the overnight shift, N.D.B.'s vital signs were noted at similar levels as at the prior reading. At 5:00 a.m. on January 24, 2009, during nursing rounds, N.D.B. was found sitting in his wheel chair.

Later that morning, at 6:11 a.m., a guard told Ogundana that N.D.B. was not responsive, so she and the medication nurse immediately went to his cell. His body was warm, but he had a very weak pulse with no breath sounds, and Ogundana could not get a blood pressure reading. The pulse oximeter device had a negative result, which she understood to indicate that "there is no life." Ogundana and the other nurse attempted CPR, but N.D.B. was pronounced dead as of 7:12 a.m.

An autopsy was performed the following day. The final autopsy report listed the cause of death as "[c]ardiomegaly with ventricular dilatation complicated by amitriptyline [Elavil] intoxication." The report also noted "[m]arked anemia following hepatitis treatment" as being "contributory."

The State and Hochberg each presented expert testimony concerning Hochberg's treatment of N.D.B., as well as other patients. Dr. Paul Goldberg, who was board certified in internal medicine, testified for the State. Goldberg opined that a

hemoglobin level of 9.9 represented moderate anemia, and was an expected side effect of N.D.B.'s Hepatitis C treatment, but that medical action was not required at that point. According to Goldberg, the later decrease to 6.4 was significant.

Goldberg further opined that a hemoglobin level of 5.1 was "alarming" because it was dangerously low, enough to make a person weak and confused and to cause circulatory collapse. He testified that Hochberg should have noted physical exam findings to justify his conclusion that N.D.B. was "clinically sound" at that level, and Hochberg should have considered the possibility of internal bleeding. However, Hochberg apparently disregarded that possibility, because he did not even order an occult blood test.

Goldberg also testified that Hochberg should have recognized that the nurse's notes from January 20, 2009, about N.D.B.'s falling and shakiness, showed that the anemia was affecting N.D.B. — that he was becoming symptomatic. He opined that the dizziness, in a young man who was previously functioning normally, was "quite striking" and was a sign of sickness or decompensation. According to Goldberg, having hands too shaky to hold things, along with increasing dizziness and falling, was a significant deterioration. Goldberg opined that Hochberg's failure to perceive that N.D.B. was symptomatic was "profoundly below the standard of care."

14

Goldberg opined that N.D.B.'s behavior and confusion early on January 23, 2009, were consistent with cerebral hypoxia due to anemia, and that Hochberg should have considered that condition as well, given N.D.B.'s hemoglobin level. Goldberg testified that the increase in hemoglobin from 4.3 to 4.5 was insignificant.

Goldberg acknowledged that a decision to transfuse is "based on clinical judgment," but he believed that the medical literature called for a transfusion when the hemoglobin level declined to 6, unless exceptional circumstances dictated otherwise. His final opinion was that N.D.B. was "critically ill" and that the nursing staff documented his decompensation, yet Hochberg failed to act "in the face of clear evidence that this was a very sick patient," which was "unequivocally a gross deviation."

Goldberg later acknowledged that weighing the risk of transfusion against the risk of harm from not transfusing was also a matter of clinical judgment, and that a patient's being immuno-compromised would make the risks from transfusion "at least somewhat greater." However, Goldberg testified that the risk of complications was still quite low, and the risk to N.D.B. of having a transfusion was greatly outweighed by the benefits. He opined that the standard of care "when confronted with this specific situation" of an anemic patient "getting sick" for uncertain

15

reasons was to "have acted vigorously," which would have included transfusion.

However, Goldberg testified that Hochberg's notes on January 23, 2009, indicating that N.D.B.'s hemoglobin no longer needed to be tested on an expedited basis, plainly showed that Hochberg was not even considering a transfusion. Goldberg opined that the approach of just watching blood counts while doing nothing "proactively" was "without a doubt" a gross deviation from the standard of care, at least by the time N.D.B.'s hemoglobin level declined to 5.1 and lower.

When confronted with an article stating that administering Epogen could be an alternative to "chronic transfusion" for treating anemia caused by drugs used to treat Hepatitis C, Goldberg explained that N.D.B.'s anemia was acute rather than chronic. He also explained that a transfusion can increase the hemoglobin level by two grams per deciliter within an hour, whereas Epogen takes four weeks to increase it by one gram.

When asked if a transfusion would have been of any benefit if N.D.B. had in fact been suffering from amitriptyline toxicity, due to Elavil, Goldberg opined that relieving the burden of anemia would have increased N.D.B.'s capacity to handle other problems, including such toxicity. Goldberg testified that he would have found deviations from the standard of care even if N.D.B. had

recovered, and he was not basing his conclusions on an assumption that anemia was the cause of death.

Goldberg opined that Hochberg had full responsibility for all of N.D.B.'s care because he was the prison medical director. As N.D.B.'s condition worsened, the patient records did not show that Hochberg sought further advice from Husain and Soliman about anemia, or from Garcia and Mucowski about whether Elavil could have been causing N.D.B.'s symptoms.

Doctor Angelo Scotti, who testified as Hochberg's expert, was a primary care physician with a subspecialty in infectious diseases. He also had experience directing an emergency room and an intensive care unit. Scotti testified that transfusion protocols became more conservative starting in the 1980s, when increasing numbers of patients acquired infections such as hepatitis and HIV from transfused blood. According to Scotti, transfusion is only mandated - as opposed to being a matter of clinical judgment - when a patient has hemorrhagic shock, or shock due to blood loss.

Scotti testified that transfusion is not mandated by the patient's hemoglobin level alone, but rather by the patient's entire condition. According to Scotti, the standard of care is to transfuse when mandated, and failing to do so would be a deviation. Conversely, where transfusion is not mandated,

ordering a transfusion, where there is no "true indication" for it, would be a deviation. Scotti testified that not every patient with a hemoglobin level of 5 or 6 should receive a transfusion, although he conceded that when the hemoglobin level is less than 6, "you certainly should be considering transfusion in most patients."

Scotti opined that N.D.B.'s condition, even as Goldberg described it, did not mandate transfusion. He testified that, when Hepatitis C medications decrease hemoglobin, the treatment is to stop them, which Hochberg did. Scotti acknowledged that N.D.B.'s hemoglobin "didn't remarkably increase" from the Epogen treatment, and that N.D.B. "actually died before [the hemoglobin level] came up," even though its administration was started at an appropriate time.

When asked to describe N.D.B.'s condition "during the last three or four days of his life," Scotti said that N.D.B. was "deteriorating[,]" "[a]pparently from toxicity from an anti-depressant," and that he had many symptoms of toxicity and "in fact, died from the toxicity." The symptoms were limited to the mental deterioration shown by N.D.B.'s "intermittent episodes" of imbalance and of confusion about the time of day. Scotti asserted that N.D.B. exhibited "no physical abnormalities."

18

Scotti opined that N.D.B.'s hemoglobin level was stable even though it was low. He testified that dizziness was a complication of Elavil even at normal and nontoxic levels, and in any event, dizziness was "a very difficult symptom" to assess because patients use the term to describe "almost everything." It could also have been a complication of the Epogen, because "dizziness and nausea are side effects of almost any medication." However, Scotti opined that disorientation "certainly" was not a symptom of anemia, because he had never seen anemia cause that symptom in his experience or in the literature.

Scotti acknowledged that "sometimes" Epogen has an effect "within a day or two and sometimes it doesn't happen[,]" which is why "the routine" is to order its administration for thirty days, because if it has no effect by then, "it's probably not going to work." He admitted that giving a transfusion would have been a reasonable exercise of clinical judgment in this case.

Nonetheless, based on N.D.B.'s records, Scotti would not have ordered a transfusion even when N.D.B.'s hemoglobin level was 4.3. According to Scotti, the risks of transfusion included acquiring another disease from the transfused blood, due to imperfect screening, and possible resulting damage to N.D.B.'s liver. On cross-examination, however, he admitted that by January 15, the

patient's hemoglobin had reached what a testing lab would consider "panic values" indicating a potential emergency.

In addition to opining that N.D.B.'s confusion, dizziness and other symptoms "were most likely related to his toxic levels of the anti-depressant" Elavil, Scotti agreed that Hochberg should have been familiar with Elavil. In response to a question from the ALJ, Scotti confirmed that Hochberg "should have considered . . . if Elavil was playing a part" in the patient's symptoms. He admitted that the medical records did not reflect such consideration. Scotti denied, however, that Hochberg necessarily should have documented his consideration of that possibility. He asserted that it was "appropriate" to note a differential diagnosis in the patient's records but "it's certainly not always done."

Hochberg did not testify at the hearing.

## II

In his initial decision, the ALJ found that Scotti's experience with transfusion justified giving his opinions greater weight than Goldberg's opinions. The ALJ relied on Scotti's testimony in finding that the standard of care did not mandate a transfusion for N.D.B. at any particular hemoglobin level. He credited Scotti's opinion that Hochberg did not deviate from the standard of care by making a clinical decision to give Epogen the

"necessary time" to work while remaining open to a transfusion "at some point."

However, the ALJ agreed with Goldberg's opinion that Hochberg committed "a substantial departure from the standard of care," and thus gross negligence, by failing to consider whether N.D.B.'s symptoms could have reflected a condition other than anemia that required hospitalization and transfusion. In particular, he found that Hochberg should have considered whether the medication in N.D.B.'s "mental-health-related regimen" was producing N.D.B.'s symptoms. The ALJ found that Hochberg could have pursued that inquiry himself or ensured that it was pursued by Garcia, the doctor who was "most directly responsible for and trained to deal with" N.D.B.'s psychiatric issues and medication. The ALJ noted that Scotti did not disagree with that view.

In rendering its decision, the Board relied on the same medical evidence as the ALJ. However, the Board relied on its "collective medical expertise" to "reject [the ALJ's] finding that the expert opinion of Dr. Scotti was more persuasive than that of Dr. Goldberg," and to reject the ALJ's "conclusions of law" about negligence, which the ALJ based on Scotti's testimony.

The Board agreed with Goldberg that N.D.B. was symptomatic in numerous ways to the point of becoming critically ill, and that he needed a transfusion, regardless of whether the "precise cause"

21

of his condition was anemia or tricyclic toxicity. The Board rejected Scotti's testimony that Hochberg had a justification for waiting for N.D.B. to become "symptomatic" and to see if N.D.B. would show a significant response to the Epogen. The Board found instead that "the patient record" showed that N.D.B. was already symptomatic by the time his hemoglobin level declined to 4.3, with syncope, disorientation, and muscle weakness. It was "inconceivable" to the Board that anyone with a hemoglobin level of 4.3 would not be symptomatic.

The Board further agreed with Goldberg that "the most minimal standard of care" required an occult blood test, evaluations by a neurologist and hematologist, and a CT scan, which were "simple tests" that Hochberg failed to order. Rejecting the ALJ's view on this point, the Board concluded that Hochberg's failure to address N.D.B.'s "critically low" hemoglobin level constituted gross negligence.

The Board adopted the ALJ's conclusion that Hochberg had been grossly negligent "in failing to seek a psychological consult during the last days of N.D.B.'s life." That conclusion reflected Scotti's testimony that Hochberg should have focused on the possibility that the patient had toxic levels of Elavil in his system.

On this appeal, our review of the Board's decision is limited and deferential. See In re License Issued to Zahl, 186 N.J. 341, 353 (2006). We will not disturb the Board's findings so long as they are supported by substantial credible evidence, "considering the proofs as a whole with due regard to the agency's expertise." Close v. Kordulak Bros., 44 N.J. 589, 598-99 (1965).

Hochberg contends that the Board should have deferred to the ALJ's evaluation of the expert witnesses, and particularly to his decision that Scotti's opinion on the transfusion issue was more persuasive than that of Goldberg. He also asserts that the Board's decision was not supported by substantial credible evidence. We disagree.

The Board owes deference to the ALJ's evaluation of lay witness testimony, and must clearly explain a decision to disagree with that evaluation:

> In reviewing the decision of an administrative law judge, the agency head may reject or modify findings of fact, conclusions of law or interpretations of agency policy in the decision, but shall state clearly the reasons for doing so. The agency head may not reject or modify any findings of fact as to issues of credibility of lay witness testimony unless it is first determined from a review of the record that the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record. In rejecting

or modifying any findings of fact, the agency head shall state with particularity the reasons for rejecting the findings and shall make new or modified findings supported by sufficient, competent, and credible evidence in the record.

[N.J.S.A. 52:14B-10(c) (emphasis added).]

On the other hand, the Board is expected to use its expertise in evaluating the testimony of expert witnesses. "While the Board, sitting in a quasi-judicial capacity, cannot be silent witnesses as well as judges, an agency's experience, technical competence, and specialized knowledge may be utilized in the valuation of the evidence." In re Silberman, 169 N.J. Super. 243, 256 (App. Div. 1979) (quoting N.J. State Bd. of Optometrists v. Nemitz, 21 N.J. Super. 18, 28 (App. Div. 1952)), aff'd o.b., 84 N.J. 303 (1980). In this case, as in Silberman, "the Board evaluated the evidence in the light of its expertise -- an expertise not possessed by the [ALJ]." 169 N.J. Super. at 256.

Based on its collective expertise, the Board accepted Goldberg's testimony that, once the patient's hemoglobin levels dropped to a dangerously low level, the risks of withholding a transfusion far outweighed any possible risks of the transfusion itself. We find no basis to second-guess the Board's judgment. Unlike Scotti, Goldberg explained that the potential risks of a transfusion were statistically remote, as compared to the

substantial risks presented by the patient's extremely low hemoglobin levels. The Board also found, based on the evidence, that the patient "was symptomatic and experiencing syncope, disorientation and muscle weakness," warranting that he be hospitalized for further testing and a transfusion. The Board's conclusion, that Hochberg's failure to take those steps was gross negligence, is supported by substantial credible evidence.

We likewise find no merit in Hochberg's contention that the Board and the ALJ both erred in finding that Hochberg was grossly negligent in failing to order a review of the patient's psychiatric medication. The record reflects that the psychiatrist was giving the patient a high dosage of Elavil, based on his belief that the patient could tolerate that dosage. The patient's electronic medical records, including his psychiatric treatment records, were available to Hochberg, and Scotti confirmed that Hochberg should have been familiar with Elavil.

The ALJ found that, as the patient's condition worsened, Hochberg should have asked the psychiatrist to re-evaluate him to determine whether his symptoms were related to the dosage of Elavil. The Board accepted the ALJ's findings, which on this issue, were supported by Scotti's testimony. The Board's decision that Hochberg committed gross negligence, in failing to request a

psychiatric consultation, is supported by substantial credible evidence.[4]

## IV

Lastly, Hochberg argues that the license suspension, penalties and fees are excessive. We find no merit in those arguments.

Our review of the Board's decision is highly deferential and we may not substitute our judgment for that of the Board. Zahl, 186 N.J. at 353-544. We will not intervene unless the sanction is outside the agency's authority, or the "punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Id. at 354 (quoting In re Polk, 90 N.J. 550, 578 (1982)). The Board was authorized to impose a penalty of up to $10,000 for a first violation and up to $20,000 for each separate or subsequent violation. N.J.S.A. 45:1-25(a). We find nothing illegal or conscience-shocking in the $60,000 penalty the Board imposed.

Nor do we find anything shockingly unfair in the five-year license suspension, which if Hochberg undergoes the retraining the Board required, may allow him to return to practice on a

---

[4] To the extent not specifically addressed, Hochberg's arguments are without sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E). We decline to consider arguments raised for the first time in his reply brief.

probationary basis after two years.  The Board based the suspension on its finding of "a clear pattern, spanning more than ten years, of failure to recognize and aggressively treat significant medical issues and poor recordkeeping."  Additionally, based on findings of gross negligence as to the five patients who were the subject of the complaint, the Board questioned Hochberg's "ability to provide competent basic medical care."  Hochberg has not appealed from most of those findings.  We affirm the suspension, as well as the $60,000 penalty.

Likewise, we find no basis to disturb the award of costs and counsel fees, much of which the Board awarded at the rate of $175 an hour for an attorney with twenty years of experience.  Further, the Board carefully reviewed the application, and made reductions where it believed the amounts were excessive.  A fee award "will be disturbed only on the rarest of occasions, and then only because of a clear abuse of discretion."  Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)).  We find no clear abuse of discretion here.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27

A-0503-16T2